**UNITED STATES DISTRICT COURT FOR THE EASTER DISTRICT OF MISSOURI**

| | |
|---|---|
| UNITED STATES | : |
| | : |
| *v.* | : |
| | : Crim. No. No. 4: 23 CR 714 RWS/NCC |
| BILL, ALAN | : |
| | : |
| *Defendant.* | : |

**DEFENDANT'S MOTION FOR
RECONSIDERATION OF PRETRIAL DETENTION ORDER**

Defendant Alan Bill ("Bill"), by and though undersigned counsel, hereby respectfully moves this Honorable Court, pursuant to the Federal Rules of Criminal Procedure, 18 U.S.C. § 3141 *et seq.* to reconsider its Order of detention and to release Mr. Bill under the supervision of the Pretrial Services Agency.  As grounds for this motion Mr. Bill states as follows:

On January 26, 2024, this Court held a hearing on Mr. Bill's request for release pending trial.  The honorable court did not rule on the motion at the conclusion of the hearing, but it  denied the request for release on  February 6, 2024. In rendering its decision, the Court noted that weight of evidence against Mr. Bill is strong. The honorable court has also determined, that  Mr. Bill has failed to introduce evidence to overcome presumption arising under 18 U.S.C. 3142 (e)(3), that Mr. Bill lacks proper ties to the United States. It was also determined, that Mr. Bill lacks legal status in United States and that based on bilateral Extradition Treaty Between Slovakia / EU, it is unlikely that Mr. Bill would be extradited to United States.

1

I. **Defendant is Filing New Bond Package as a Security Measure**

The Defendant through his Counsel pleads to Honorable Court new conditions, which should adequately mitigate any flight risk or danger to the community that the government unreasonable believes exist. Defendant, through his Counsel remains open to any additional and further restrictive measures, to the extent that the Honorable Court finds them necessary.

- a. **Security Interest**.  Defendant and his parents, as his immediate relatives, will stake unencumbered assets worth in excess of $560,000.00. In particular, Defendant's parents are prepared to grant an interest in one property in Bratislava, Slovakia valued at over $240,575; a second property in Bratislava, Slovakia valued at over $320,670. Defendant will provide all documentation necessary to satisfy the government that these assets (a) have the value claimed, (b) are unencumbered, and (c) can easily be transferred to the government's possession in the event Mr. Bill violates any condition of his release. In accordance with the above, Mr. Bill will execute an agreement to forfeit all property posted if he violates any condition (**See Exhibit A – Affidavit of Defendant's Mother, Eva Potuckova and Property Deed, Exhibit B – Affidavit of Defendant's Father Jaroslav Bill and Property Deed, and Exhibit C – Affidavit of Real Estate Agent**) .
- b. **House Arrest**.  Mr. Bill will rent an apartment near the courthouse using his own funds (**See Exhibit D**).  He will be on house arrest with limited, scheduled opportunities to visit the grocery store, a park nearby for exercise, and other specifically defined activities approved by Pretrial Services. Any movement outside the apartment will be subject to a curfew of 1900.  Mr. Bill will also be intensely supervised on his movements by a private security company which will report to Pretrial Services 24/7 (**See Exhibit E**).

c. **Monitoring and Check-Ins**. To ensure his compliance with the above, Mr. Bill will wear, at his own expense, an ankle always monitor. Mr. Bill will check in each day at a regular, specified time with Pretrial Services.

d. **Technology Access**. Mr. Bill will agree to have no access to computers, internet, weapons, or any other technology without the prior approval of Pretrial Services.

e. **Security Detail**. Mr. Bill will engage a private security detail (the "**Detail**") at his own cost. The Detail will report to Pretrial Services and abide by the restrictions imposed by the Court. Mr. Bill will be under guard 24/7. The Detail will monitor Mr. Bill via video system 24/7 and report all activity to Pretrial Services and monitor all calls other than calls with Mr. Bill's attorney. While the Detail will not prevent Mr. Bill from leaving the established residency, pursuant to its contract with Mr. Bill and at the Court's direction, the Detail will notify Pretrial Services *immediately* if Mr. Bill violates the geographic limitations of his restriction or any other condition of his release. (**See Exhibit E**).

II. **Defendant Presents New Exculpating Evidence**

   a. **Government Has Failed to Provide Any Incriminating Evidence**

Despite of the fact, that Defendant is detained without bond for over 100 days, Government has failed to file incriminating evidence to prove Defendant's guilt. See (**Exhibit F – Expert's Affidavit**).

Forensic expert Eduard Jenco, Phd. has on March 18, 2024, received a flash drive, which, according to the US Attorney´s Office statement, was supposed to contain evidence for the defense's examination. The forensic expert of the defense initiated the primary process of

3

verifying the authenticity of digital evidence. This process always precedes the actual forensic examination of digital evidence.

The defense expert was also provided with an Excel file by the prosecutor containing a list of evidence intended to be submitted by the government to the defense.  Mr. Jenco conducted an initial assessment of what the government had submitted and found that the government did not submit evidence. What the government submitted are neither original digital evidence nor other evidence, nor their forensic duplicates (**See Exhibit F at 16,17).**

The government only submitted four types of files, which are merely indirect reproductions and excerpts created by the government to remove all relevant details from the original digital evidence.

Furthermore, the defense forensic expert noted, that from the submitted files, there is no information about the origin of the digital evidence, the process by which it was created, its processing, evaluation, or its relevance for the criminal case. The submitted files are only forensically unexaminable non-original incomplete excerpts from possibly original evidence after removing all forensically relevant details.  The non-examinability of non-original evidence constitutes one of the basic premises of forensic science. Examining non-original or derived evidence results in obtaining inaccurate results of forensic examination.

An indirect reproduction created from evidence is not evidence. It is merely an excerpt, which as such is excluded from direct forensic examination. (**See Exhibit F at 17).**

The main problem with non-original evidence, as well as with indirect reproductions of evidence, is the lack of certainty regarding their reliability and integrity. In the process of forensic examination, emphasis must always be placed on the authenticity and reliability of

4

evidence to ensure a fair and accurate decision. However, non-original evidence or indirect reproductions or excerpts from evidence can be easily influenced or altered, leading to unfair assessment of the situation and inaccurate forensic examination results.

Additionally, in the forensic examination of digital evidence, it is critical to examine the source and origin of the evidence. Identifying its origin and transmission can provide useful context for interpretation and assessment of the reliability. The use of original evidence is crucial for preserving integrity. Only original evidence can be examined by the defense to ensure the right to a fair trial.

Besides of failure to file original evidence necessary for forensic examination, the Government has also filed, within first set of discovery on February 5, 2024, thousands of pages of shopping coupons, medical record and emails of unknown individuals not related to Defendant.

Taking into account, that Prosecutor has failed to meet January 23, 2024, deadline as set by to Honorable Judge for the discovery, Defendant therefore moves for sanctions against Prosecutor for failure to present evidence in underlying case in timely manner.

    **b. Evidentiary Conclusions Based on Clustering Used to Elicit Indictment Were Highly Unreliable**

The indictment issued by grand jury against the Defendant was based on an affidavit of David J. Ogurek, Special Agent of the Federal Bureau of Investigation (FBI) from December 14th, 2023, and his conclusions regarding the identification of the administrator of a darknet marketplace.  The forensic expert retained in this case, upon examination of evidence submitted

5

by the government came to determination, that conclusions used to elicit indictment were not technologically justified (**See Exhibit F**).

In short, Specific cryptocurrency transactions from a cluster or group of cryptocurrency addresses used by Kingdom were traced to cryptocurrency wallets held in the name of BILL. Based on the timing and amounts of these transactions, Mr. Ogurek erroneously believes these payments were made to an administrator of Kingdom, and as he claims to the Defendant. That conclusion is wrong.

In the cryptocurrency environment, clusters of transactions can be created based on similarities in different attributes, such as transaction size, timestamp, used addresses, etc. This technique focuses on identifying addresses that could hypothetically be assigned to a single subject or entity.

However, it is only a heuristic analytical method based on general probabilistic models with a high degree of uncertainty.  Clustering and grouping in the context of tracing cryptocurrency transactions are significantly unreliable from an evidentiary perspective. Clustering and grouping in the tracing of cryptocurrency transactions outside laboratory conditions achieve accuracy only somewhere between 7.34% - 36.52%. The highest achieved reliability rate of results is 42.53%. **(See Expert's Affidavit, Exhibit F at 7**).

Address clustering aims to address pseudo-anonymity by grouping Bitcoin addresses to eventually reveal real identities. However, none of the heuristic algorithms for address clustering have been successfully accepted in legal proceedings due to their heuristic nature. According to the Daubert standard, for an algorithm to be admissible, it should have a known error rate. The

6

error rate helps determine the extent to which the court can rely on evidence, but no address clustering algorithm is capable of reporting error rates.

Clustering and grouping have a very low reliability rate. From a forensic perspective, clustering and grouping are not admissible for drawing any relevant conclusions. Even if we were to hypothetically admit that clustering and grouping were sufficiently accurate (which is by no means the case), it would not prove that BILL was the person receiving payments for services provided by Kingdom Marketplace. It would at most demonstrate that BILL had unidentified repeated transactions with a person who was an administrator of Kingdom Marketplace. However, it is not possible to conclusively prove whether these transactions were in any way related to the operation of Kingdom Marketplace.

### c. Matching IP Addresses Used to Indict Defendant Were Erroneously Linked to Defendant

The second issue used in the affidavit of FBI agent Ogurek is a specific IP address ("IP ADDRESS 1") that was used to access a Kingdom Reddit account was also used to access BILL's cryptocurrency accounts, his email address, and to apply for an ESTA application for BILL.

Specific communication routing processes are applied to operate within the TOR network. TOR is an anonymization network that allows users to connect to the internet without being easily identifiable. The communication routing system within the TOR network is complex and designed to ensure anonymity and security for its users. Onion routing is a technique where each message is encapsulated in multiple layers, with each layer adding another level of encryption.

TOR utilizes thousands of voluntary network participants who operate network nodes. Each user's computer is a network node. Network nodes are computers that provide a connection between the user and the target server.  All data communication passes through these communication nodes, and each node only knows about the previous and next nodes.

A user enters the TOR network through entry nodes and exits through exit nodes. These nodes are part of a one-time temporary connection.  The Kingdom Marketplace administrator accessed the internet through the TOR network. This means that none of the servers saw their real IP address. If BILL used the TOR network, his computer became a communication node for tens of thousands of other computers in the network that routed their communication through BILL's computer. If BILL accessed the REDDIT server through the TOR network, this server would not see his IP address, but the IP address of another node randomly selected by the system in the network. BILL accessed common websites such as Gmail, and the ESTA form probably through a regular web browser. Thus, these servers saw the IP address of his computer. However, when he was connected to the TOR network, the system assigned the IP address    of his computer to the communication of other TOR network users.

As a TOR network user, BILL had no way of seeing what communication was passing through his computer, as all communication is secured by multi-layer encryption. Therefore, the IP address of BILL's computer appeared in the REDDIT server logs.

### d.  FBI Erred in Identifying Defendant as "Vend0r" and as „KingdomOfficial"

The FBI states that BILL's email account has several saved images, videos, and files that contain the word "Vend0r." Vend0r is the username of the individual who created the Kingdom subdread on Dread.

8

For unknown reasons, government withholds specific details about the email messages and their actual content. Considering the previously identified cryptocurrency payment from BILL's wallet to the Kingdom Marketplace Administrator's wallet, it is evident that there was unidentified economic activity between the Kingdom Marketplace Administrator and BILL. This might imply that BILL used or was using Kingdom Marketplace's services, thus communicating with the Kingdom Marketplace Administrator. However, it does not prove that BILL was the Kingdom Marketplace Administrator. The fact that BILL is likely not the person referred to as "KingdomOfficial" is further supported by the evidence that the individual "KingdomOfficial" has an official channel on the social media platform Telegram. The person acting under the name "KingdomOfficial" posted on this channel even during the time when BILL was in custody. It is highly improbable that BILL could manage an active Telegram channel and post on it multiple times a day from detention. This official channel has 233,018 active followers as of January 13, 2024. (**See Exhibit F at 11**).

    **III.**    **Defendant Presents New Evidence of Ties To The United States**

Defendant has applied on for U visas as he is a victim of qualified criminal activities in the United States. His U visa application is currently pending with the USCIS, case number **EAC2410950418 (See Exhibit G- USCIS Receipt Notice)**.

Besides of having a pending lawful status in United States, Mr. Bill Mr. Bill entered United States on December 14, 2023 and he entered United States under Visa Waiver Program, which allows citizens of mostly EU nations to enter United States with their passport and an online ESTA application only. See *Exhibit I – Defendant's I 94 Arrival Record*).  According to the Defendant's immigration record, Defendant was admitted to United States on December 14, 2023 for the period of 90 days until March 13, 2024 but on January 14, 2024 the DHS has

9

purposefully decided to revoke Defendant's lawful status leaving him in United States without any lawful status. Government's argument, that Defendant falls short of any lawful status is therefore deliberately willful as it was the government that stripped Defendant of his lawful status.  On January 25, 2024 Defendant applied for U visa as a victim of qualified criminal activity in the United States. Defendant was therefore purposefully out of his lawful status and he was out on status for eleven days before he applied for new status in United States.

Not only is the Defendant not subject to 3 year bar as defined INA §212(a)(9)(B)  which reads: Any alien (other than an alien lawfully admitted for permanent residence) who- (I) was unlawfully present in the United States for a period of more than 180 days but less than 1 year, voluntarily departed the United States (whether or not pursuant to section 244(e)) prior to the commencement of proceedings under section 235(b)(1) or section 240, and again seeks admission within 3 years of the date of such alien's departure or removal, or (II) has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States, is inadmissible, Defendant has currently a pending new status in the United States by virtue of  212(a)(9)(B)(ii) of the Immigration and Nationality Act. This INA provision states that an alien is unlawfully present if he or she is present in the United States without admission or parole or beyond the period of stay authorized by the Attorney General. Section 212(a)(9)(B)(iv) of the Act, however, is· a tolling provision that covers certain nonimmigrants. Specifically, if the alien has timely filed a nonfrivolous application for extension of status or change of status, the first 120 days of unlawful presence are not counted towards the 3-year bar under section 212(a}(9)(8}(i)(I) of the Act. The Service has designated as a period of stay authorized by the Attorney General the entire time during which a timely filed, non-frivolous application for *E/S* or *CIS* is pending, provided the alien meets the requirements set forth below. Aliens who meet these requirements are not subject to

10

Case: 4:23-cr-00714-RWS-NCC   Doc. #:  70   Filed: 04/03/24   Page: 11 of 19 PageID #: 749

section 222(g). Defendant Alan Bill is therefore currently not accruing any period of unauthorized stay.

In addition to that, according to Defendant's immigration record, during his four trips to United States, Defendant has never violated terms of his nonimmigrant status and he always departed United States on time (**See Exhibit I**).

  IV.   **Defendant Presents Evidence That Slovakia Has Previously Extradited Its Citizens to United States**

In his written decision, the Honorable Judge determined, that Defendant poses a risk of flight as Slovakia does not extradite its citizens to United States.  Defendant submits with the underlying motion evidence, that Slovakia permits for extradition of its citizens to United States (**See Exhibit J & K**).  Slovakia, based on bilateral treaty with the United States and based on treaty between the EU and USA does extradite its citizens to Slovakia.

The legal instrument on extradition concluded between the United States of America (*hereinafter referred to as "US"*) and the Slovak Republic ( *hereinafter referred to as "Slovakia"* ) represents an international treaty in the field of legal relations with foreign countries in criminal matters , which according to § 478 of the Slovak Criminal Code has precedence over the provisions of the Criminal Code (See **Exhibit L – Slovak Code of Criminal Procedure)**.

According to article 7 par. 4 of the Constitution of the Slovak Republic, the Legal Instrument is a presidential international treaty, the implementation of which requires a law and, before ratification, the approval of the National Council of the Slovak Republic (Slovak Parliament). All

11

these requisites have been fulfilled and it is currently an international bilateral treaty, based on which the agreed extradition of persons is carried out.

The legal instrument follows on from the Treaty between the European Union and the US on extradition, which was signed on June 25, 2003, and which in Article 3 par. 2 letters a) presupposes the conclusion of a bilateral legal instrument ( *English "instrument"* ) between the member states of the European Union and the US on the application of a valid bilateral treaty on extradition between them under the conditions specified in Article 3 par. 1 letter a) to letter k) of the cited Agreement.

Slovakia has a bilateral treaty with the US on the mutual extradition of criminals from 1925 and an additional treaty from 1935, and subsequently a Legal Instrument was adopted for this agreement.

Precisely because of the more effective fight against crime and potential threats directed against both countries, Slovakia and the US signed on June 25, 2003, not only the Legal Instrument, but also another Legal Instrument on mutual assistance in the field of criminal law, on the basis of which the states exchange information when investigating money streams and transfers, create joint investigative teams, use videoconferencing tools when conducting interrogations, etc.

Pursuant to Article I of the Legal Instrument, the US and Slovakia agree to surrender, upon duly made request under this Treaty, any person who is charged with or convicted of any of the crimes listed in Article II of this Treaty and who seeks refuge or is located in the respective territories ; the condition is that such handover will take place only on the basis of such evidence of criminal activity which, according to the legal order in force in the place where the fugitive or the accused person was found, would justify his detention and handover to the court, if it had been committed in that place crime.

12

Exceptions to the right to extradite persons relate to political crimes, as well as if the crime could be imposed or carried out by the death penalty under US law.

According to Art. IX of the Legal Instrument, the US and Slovakia also agreed that <u>none of the contracting parties has an obligation to extradite their own citizens</u>.

The stated provision does not mean that the extradition of a criminally prosecuted person would not be possible according to this Legal Instrument , on the contrary, upon adoption of the Legal Instrument as it appeared from the media reports at the time, which also questioned the Minister of Justice Daniel Lipšic at the time ( *currently The Special Prosecutor of the General Prosecutor's Office of the Slovak Republic, which investigates the most serious crimes such as organized crime, corruption cases* ), the Legal Instrument on Extradition as well as the Legal Instrument on Mutual Assistance in Criminal Matters, " *seal cooperation in the extradition of own citizens who have committed a crime in the territory of the other country and in the field of legal assistance, if the crime has a cross-border dimension* ".

In relation to the extradition of Slovak nationals for criminal prosecution abroad, it should be noted that in the continental legal system, the principle of prohibiting the extradition of one's own citizens for criminal prosecution abroad is used, which is related to the criminal law principle of personality. Such a principle was enshrined in the Constitution of the Slovak Republic. However, the special constitutional law no. 90/2001 Coll. with effect from 01.07.2001, the Slovak Parliament deleted from the constitutional article 23 par. 4 of the Slovak Constitution prohibits the extradition of citizens of the Slovak Republic.

As a result of this fact, Slovakia is authorized to extradite Slovak citizens abroad for criminal prosecution, e.g. also on the basis of the Rome Statute of the International Criminal Court, the instrument of ratification of which was deposited with the UN Secretary General in New York on 11/04/2002, further according to the European Arrest Warrant Act within the European Union,

13

further on the basis of decisions of international organizations such as UN Security Resolution no. . 955 from 1994 on the establishment of an international tribunal for Rwanda as amended by later resolutions, UN Security Council Resolution no. 827 from 1993 on the establishment of an international tribunal to prosecute persons responsible for serious violations of humanitarian law in the territory of the former Yugoslavia, as amended by later resolutions.

Therefore, even if the legal instrument on extradition does not specify the obligation to extradite, it does not mean that it is not legally permissible to extradite a Slovak citizen to the US for criminal prosecution.

In relation to international extradition treaties concluded by the US with many countries of the world, the Congressional Research Services published on 04.10.2016 a legal study entitled: "*Extradition To and From the United States: Overview of the Law and Contemporary Treaties*" and in which the authors stated that: "*The second and most common type of treaty clause provides that "none of the contracting parties shall be obliged to extradite its citizens or persons..."*"; in this regard, *"Congress has enacted legislation to overcome a judicial construction that would preclude the United States from extraditing an American under such provisions"*.

The same is true in Slovakia. These necessary tools are in the provisions of § 509 of the Slovak Criminal Code and relate to the admissibility of extradition of a person abroad for criminal prosecution (**See Exhibit M**). The admissibility of the extradition of such a person is decided in the first instance by the regional court on the proposal of the prosecutor, then by the Supreme Court of the Slovak Republic. The final decision on extradition of a person abroad for criminal prosecution is made by the Slovak Minister of Justice. In this special procedure, the conditions under which it is or is not permissible to extradite a person abroad for criminal prosecution and whether these conditions have been met by the requesting party are examined.

14

In this context, we point to the publicly known case of Slovak citizen Adrián V., who was sentenced in New York to nine years and four months in prison for attempting to import a large quantity of drugs into the US for violating American federal laws. Adrián V. was extradited from Thailand to the US in November 2013, <u>even though an arrest warrant was issued for him by a Slovak court for another criminal activity</u>. It is obvious that if there was a ban on the extradition of Slovak citizens to the US for criminal prosecution in Slovak American relations, then such an extradition of a Slovak citizen to the US for criminal prosecution could not occur, regardless of the fact that he was in Thailand at the time. See ***Exhibit J*** for further details.

### V. Defendant Has Petitioned United Nations Human Rights Office of the High Commissioner to Investigate His Human Rights Violations

The U.S. authorities' actions against Defendant violated several Defendant's rights as declared in the International Covenant on Civil and Political Rights. In particular, Defendant's **right to liberty and security of person**, according to which no one shall be subjected to arbitrary arrest or detention [according to Article 9(1)], **Defendant's right to be informed of the reasons for arrest at the time of the arrest and to be informed without delay of the charges against Defendant (in his native language)** [according to Article 9(2)]. Art. 14 par. 3 letters a), according to which anyone accused of a criminal offense should be informed without delay in the language in which understands, about the nature and reason of the accusation against him and Art. 14 par. 3 letters f), according to which everyone who is accused of a criminal offence, he should be provided with the help of an interpreter if he does not understand the language or he does not speak the language used in court. These obligations of the US government also follow from the Code principles that were adopted by the resolution of the UN

15

General Assembly no. 43/179 dated 09.12.1988 specifically according to principle no. 14, a person who does not sufficiently understand the language used by the authorities responsible for her arrest, detention or imprisonment, or does not speak this language, is entitled to immediately receive, in a language she understands, the information specified in Principle no. 10 (i.e. information about the reasons for the arrest and about all the charges brought against him), in Principle no. 11  (i.e. no person shall be detained without a judicial or other authority  effective opportunity for an immediate hearing), in Principle no. 12 point 1 and in Principle no. 13 (i.e. organ  responsible for the arrest, detention or imprisonment shall provide each person at the time of arrest  and at the beginning of detention or imprisonment or immediately after, information and explanation about it  rights and how to use these rights yourself) and have, if necessary, the free help of an interpreter in  in connection with the judicial proceedings after his arrest. If the defendant has not yet been lawful  in a manner familiar with the reasons for his arrest or with the reasons for his accusation, he could not have either adequate time to prepare your defense, although according to Art. 14 point 3 letter b) Pact, everyone who is  accused of a criminal offense should have enough time and opportunities to prepare his defense and to  he could connect with counsel of his own choosing.

The U.S. authorities did not apply the general rule, that persons awaiting criminal proceedings **need not be held in custody**, when the court refused to release Defendant from custody on bail and against the guarantees offered from me, citing the risk of his escape, which it saw as mainly due to the fact that Defendant did not establish ties in Missouri  and despite the fact that Defendant's passport was seized by the U.S. authorities (a fact which precludes any possibility of escape) [according to Article 9(3)]. During Defendant's arrest and detention, the U.S. authorities  violated his **right to be treated humanely and with respect for the inherent dignity of the human being** [according to Article 10)]. (**See Exhibit N**).

16

Defendant also submits a letter from, Human Rights Institute which provides a guarantee for Defendant. (**See Exhibit O**).

### VI. Defendant Presents New Evidence of His Legal Income

Defendant presents additional evidence proving his legal income and hardship suffered by his immediate relatives, while Defendant is being detained without a bond.

With regards of Defendant's criminal and professional background, Defendant has no criminal record of any kind (**See Exhibit P – Extract From Slovak Criminal Registry**). While living in Slovakia, Defendant was the CEO of his own company (**See Exhibit R**).  Defendant's company, AMBE LLC, was primarily dedicated to installation of air condition units (**See Exhibit S**) and to cryptocurrency exchange (**See Exhibit T – Decision of Slovak Tax Office Registering the Business**). As a requirement to operate this business, Defendant has prepared a project to ensure the fulfillment of obligations arising from Act no. 367/2000 Coll. on protection against the legalization of income from criminal activity as amended for a business company and its employees (hereinafter referred to as the company), considering the legal obligation of confidentiality in accordance with legal provisions (**See Exhibit U).**

Defendant's prolonged detention has caused major suffering to his retired parents. Defendant's mother, Eva Potuckova submitted a sworn statement proving, that Defendant is the main breadwinner for their family and that Defendant would take care of all her daily needs, such as medical appointments (**See Exhibit V**).   In addition to that, Defendant's father, Jaroslav Bill, is a cancer patient and he is just about to undergo major open-heart surgery (See **Exhibit Z** – affidavit and medical record). Defendant himself suffer from multiple medical conditions and he is being denied proper healthcare while detained (**See Exhibit X**).

### VII. Defendant Moves to Honorable Court for Reasonable Bond

The issue of bond in criminal cases has been adjudicated by the Supreme Court on multiple occasions. In *Stack v. Boyle*, the Supreme Court found a $50,000 bail to be excessive, given the defendants' limited financial resources and the lack of evidence that they were a flight risk. The Court determined that "the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant," and "[u]nless this right to bail before trial is preserved, the presumption of innocence . . . would lose its meaning.". *Stack v. Boyle,* 342 U.S. 1*, 5 (1951)*. The Court explained that "the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant."

The Defendant is also unable to use proper technical equipment in detention facility where Defendant is detained to investigate evidence against him.

The issue of bail is only implicated when there is "a direct government restraint on personal liberty, be it in a criminal case or a civil deportation proceeding. The Supreme Court has explained that explaining that the Bail Clause guards against the potential for governmental abuse. *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257*, 263 n.3 (1989)*. The Defendant therefore moves to Honorable Court for a grant of reasonable bond.

18

## CONCLUSION

When rendering its order on bond in the instant case, this court did not have full record of evidence due to error of Defendant's former Counsel and due to newly discovered evidence. Given the newly discovered evidence and evidence not previously filed, it is necessary for the court to reconsider its bond decision.

**WHEREFORE** for the foregoing reasons and any others that may appear to the Court, Defendant respectfully requests, that he be released pending trial in this matter subject to the conditions set forth above.

Respectfully submitted,

/s/ Lenka Droscova, Esq.

Counsel for the Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2024, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record.

/s/ *Lenka Droscova, Esq.*

Counsel for Defendant

Bar Number 338064CA

626 Wilshire Blvd Ste 410

Los Angeles, CA 90017

19