**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:23 CR 714 RWS/NCC |
| | ) | |
| ALAN BILL, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT ALAN BILL'S SUPPLEMENTAL BRIEF
IN SUPPORT OF HIS REQUEST FOR A *FRANKS* HEARING**

Over the course of the past year, the Government has done little but deflect attention away from the defective search warrants that form the shaky foundation for its case. A cursory overview of the evidence—or lack thereof—against Mr. Bill reveals that its search warrants were premised entirely on inaccurate statements and pseudoscience. Mr. Bill has shown that Special Agents Kraft and Joifrita (together, the "Affiants") made those inaccurate statements with reckless disregard for the truth, and that without these statements, the invasive search warrants related to Mr. Bill's email and the personal devices in his possession would not have been supported by probable cause. As a result, Mr. Bill has made the necessary showing to entitle him to relief, or, at the very least, a hearing on these issues under *Franks v. Delaware*, 438 U.S. 154 (1978).

In their bold attempt to prosecute Mr. Bill for mere alleged administration of an online marketplace, the Government and its agents have stretched an untested, unscientific IP tracking method beyond its limits. The Government claims that its "proprietary" technology can be used to connect Mr. Bill to criminal activity occurring on the Kingdom Market (the "Market"). But it is reckless to rely upon anonymized, untraceable IP addresses as the sole method to link Mr. Bill to the Market, much less to any crimes committed by sellers or buyers on the Market. Especially

without its bogus method of connecting Mr. Bill's supposed online activity to the activities of the Market, there affidavits do not present a sufficient basis for finding probable cause. And if there were any doubt as to the inaccuracy of the statements contained in the affidavits supporting those warrants—and the ultimate basis for probable cause in those affidavits—those doubts have now been entirely dispelled by evidence revealed during this Court's recent suppression hearing, where the Government's agents acknowledged that they lacked probable cause (or indeed, any "known information") to suggest Mr. Bill was a participant in any actual criminal activity whatsoever at the time they applied for the warrants in this case.

Despite the Government's best efforts to divert this Court's attention away from the faulty foundation propping up its entire case, a clear review of the evidence presented thus far demonstrates that Mr. Bill has, at the very least, made the necessary preliminary showing to obtain a *Franks* hearing. That is because Mr. Bill has already made a "substantial preliminary showing" (1) that the Affiants provided inaccurate information in support of the search warrants; (2) that they did so with reckless disregard for the truth; and (3) that removal of those inaccuracies would undermine the finding of probable cause supporting the warrant. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). Notwithstanding their apparent extensive "training and experience," the Affiants made numerous inaccurate statements in their affidavits supporting the each of the warrants. For all those reasons, and those explained in further detail below, Mr. Bill respectfully requests that this Court order a *Franks* hearing.

## DISCUSSION

### I. The Suppression Hearing Revealed That the Warrant Affidavits Contain False Statements Made with Reckless Disregard for the Truth

The affidavits in support of the search of Mr. Bill's email and the devices seized from his person at the airport are, at best, cobbled-together collections of misleading, inaccurate allegations

and significant omissions made with a reckless disregard for the truth. Nowhere is this more evident than in Special Agent Kraft's affidavit supporting the search of the devices collected from Mr. Bill's person during his arrival at Newark Airport on December 13, 2023. To support this affidavit, Special Agent Kraft claimed there was probable cause that Mr. Bill had committed multiple Title 21 violations.

But testimony revealed during Mr. Bill's suppression hearing indicates that, at the time of Mr. Bill's arrest, Special Agent Kraft believed there was "no known information" suggesting that Mr. Bill had been involved in any drug trafficking activity in the United States. Even worse, the statements in each affidavit claiming that agents' flimsy methods could tie Mr. Bill's online activity to crimes committed by anonymous users are wholly unsupported. Based on Special Agent Kraft's recent testimony ***alone***, Mr. Bill has made the necessary preliminary showing that several statements in the affidavit were both false and made with reckless disregard for the truth. Thus, Mr. Bill is entitled to a *Franks* hearing.

### A. Although the Applications Claimed That There Was Probable Cause to Believe That Mr. Bill Had Engaged in Drug Trafficking, Special Agent Kraft Admitted at the Hearing That, at the Time of His Arrest There Was "No Known Information" That Mr. Bill Had Done So

Mr. Kraft's testimony during Mr. Bill's suppression hearing demonstrates that that there was "no known information" at the time of Mr. Bill's arrest which could possibly support a finding of probable cause. Tr. (Doc. #192) at 192:15–20. Kraft stated in his initial affidavit that Mr. Bill had violated various provisions of Title 18 and Title 21. 12/14/23 Kraft Aff. ¶ 1. Thus, Special Agent Kraft claimed there was "probable cause to search the information described" in his affidavit. *Id.* at 5. The basis for this probable cause, according to Special Agent Kraft, was the allegation that Mr. Bill served as an administrator of a website. *Id.* ¶ 11. But as soon as Special Agent Kraft took the stand during Mr. Bill's suppression hearing, this probable cause finding fell

apart. When asked whether "the mere fact that a person is associated with the administration of a website like Kingdom Market [is] enough to create reasonable suspicion that the person has themselves committed a crime," Special Agent Kraft answered "[t]hat fact alone, I don't believe so." Tr. (Doc. #192) at 184:10–14. Despite basing his entire affidavit this assumption, Special Agent Kraft himself admitted that merely administering an online marketplace is not enough to constitute a crime.

Even worse, in a draft of a letter to port parole authorities that Special Agent Kraft wrote ***immediately prior*** to Mr. Bill's arrest, Special Agent Kraft indicated that there was "no known information which indicates that Bill is directly or physically involved in drug trafficking or terrorist activities." Tr. (Doc. #192) at 192:15–20. And even more importantly, at the suppression hearing, Special Agent Kraft testified that he believed this to be true at the time he wrote it. Tr. (Doc. #192) at 192:15-20. There was no evidence that Mr. Bill had not "directly or physically" engaged in any illegal drug activity in the United States. **Ex. B.** Thus, the statements in Special Agent Kraft's affidavit indicating that Mr. Bill committed the "target offenses" necessary to support the warrant were, by Special Agent Kraft's own admission, false. 12/14/23 Kraft Aff. ¶ 1.

### B. Although the Applications Claimed That Mr. Bill Used the Devices on His Person to Engage in Criminal Activity, Special Agent Kraft Admitted at the Hearing That, at the Time of His Arrest There Was No Evidence That Mr. Bill Used the Named Devices for That Purpose

Not only did Special Agent Kraft have no evidence that Mr. Bill had engaged directly or physical in any illegal drug activity in this country, but Special Agent Kraft also had no evidence that the owner of the devices seized upon Mr. Bill's arrival had sent ***any*** messages regarding the Market. In his affidavit, Special Agent Kraft claimed a search of the devices in Mr. Bill's possession— iPhone, RealMe cell phone, Dell laptop, and Samsung thumb drive—would reveal "evidence of [the] crimes and contraband or fruits of [the] crimes" outlined in the affidavit.

12/14/23 Kraft Aff. ¶ 5. According to Kraft, Mr. Bill, "as a Kingdom administrator, travels with electronic devices that enable him to facilitate Kingdom's continued operations and otherwise perform administrative functions." 12/14/23 Kraft Aff. ¶ 80. This was evidently enough for Special Agent Kraft to request a full-scale examination of the devices on Mr. Bill's person and claim that there was "probable cause to believe that things that were once stored on the Devices may still be stored there." 12/14/23 Kraft Aff. ¶ 86. Similarly, Special Agent Joifrita's affidavit alleged that, there was "probable cause to believe that [Mr. Bill's email] contain[ed] evidence, fruits, and instrumentalities of the subject offenses being investigated." 12/14/23 Joifrita Aff. ¶ 59. But what basis was there for Special Agent Kraft to claim that that either Mr. Bill's devices or Mr. Bill's email contained evidence of criminal activity?

As Special Agent Kraft's testimony at the hearing revealed, there was none. In fact, the Government's ***own*** image taken of Mr. Bill's phone on the day of his arrest debunks the Affiants' repeated claim that Mr. Bill used these devices "to facilitate Kingdom's continued operations and otherwise perform administrative functions." 12/14/23 Kraft Aff. ¶ 80. The image revealed several ***unopened*** chats dated from March and April of 2023, more than eight months prior to Mr. Bill's arrest. Gov. Ex. 5, RealMe Phone Photo; Tr. (Doc. #192) at 204:4–15 (acknowledging that the most recent displayed chat had more than 1500 ***unread*** messages). Given that the phone's user had last updated those chats several months prior to Mr. Bill's arrest, and there is no evidence that the owner of the phone sent any of messages relating to the Market (as opposed to merely subscribing to various group channels), the Affiants did not in fact have a genuine basis to believe that Mr. Bill had traveled with the devices for the purpose of performing administrative functions related to the Market.

To make matters worse, the devices described in Special Agent Kraft's initial affidavit do not even ***match*** the devices seized from Mr. Bill's person upon his arrival at the airport. In his affidavit, Special Agent Kraft claimed that there was a video which "shows an individual using an ***HP*** laptop computer to access the Tor browser." 12/14/23 Kraft Aff. ¶ 53. Supposedly, this user could access a display titled "MODERATOR" and work through administrative tickets generated on the Market which "are not visible or accessible to non-administrative users of the site." *Id.* at ¶ 54. This same computer is referenced in Special Agent Ogurek's affidavit.12/8/23 Ogurek Aff. ¶ 63–64. But as Officer Arnab Mondal admitted, the device seized at the airport from Mr. Bill's person was not an HP, but a "***Dell*** laptop." Tr. (Doc. #192) at 41:25–42:2 (emphasis added). The agents' decision to apply for a warrant to search one device based on evidence of an unidentified person using an entirely different computer is yet another indication of their "reckless disregard for the truth." *Franks*, 438 U.S. at 155–56.

And yet, based on the sole premise that Mr. Bill had somehow engaged in criminal activity by merely administering an online marketplace using the devices on his person, Special Agent Kraft made a request for a search warrant. He claimed probable cause existed that Mr. Bill had committed multiple Title 21 violations, but yet he now admits that, at the time, there was "no known information" suggesting that Mr. Bill had been involved in any drug trafficking activity in the United States. Even relying solely upon the testimony elicited during the suppression hearing, Mr. Bill has made the necessary showing that the search warrants contained inaccurate statements.

## II. Even Without Testimony from the Hearing, Mr. Bill Has Shown That the Affidavits Contain Materially False Statements Made with Reckless Disregard for the Truth

Even disregarding the testimony elicited during the suppression hearing, Mr. Bill's prior submissions have identified numerous other misstatements and exaggerations in the warrant applications that constitute a "substantial preliminary showing" entitling him to a *Franks* hearing.

Nowhere is that more clear than in the report submitted by Eduard Jenco on behalf of Mr. Bill, *see* Rpt. of E. Jenco (Doc. #98-1),[1] which debunks the junk "science" the Affiants relied upon when crafting their affidavits. The Affiants cited exclusively to anonymized online transactions as the basis for their suspicion that Mr. Bill allegedly served as an administrator on the Market. But just a skim through Mr. Jenco's report reveals why these bare allegations rest on false allegations and material omissions. As Mr. Jenco has explained, an IP address is connected to a device or network of devices, ***not*** a particular person. Any attempt to personally connect Mr. Bill to the Market based upon an IP address is simply not supported by the realities of the technology.

### A. Contrary to the Claims of the Affidavits, the Agents' Methods Cannot Trace Criminal Activity to Mr. Bill Using Anonymous IP Addresses

The statements supporting the search warrants all center on the idea that agents could somehow trace anonymized IP addresses across the internet back to Mr. Bill personally. IP addresses, the Affiants claimed, can be used to trace illegal activity on the internet to specific users. In his affidavit, Special Agent Kraft claims that he "believes that IP Address 1 belongs to a residential customer in Bratislava, Slovakia." 12/14/23 Kraft Aff. ¶ 28. Tying an IP address to a city of 400,000 residents, he assumes, is enough to support a finding of probable cause. But the reality is that IP address tracking is, ***at its very best***, a way to narrow online transactions down to certain devices or networks of devices. At its worst, IP address tracking can lead agents to a user halfway across the globe whose local IP address has been manipulated through the use of Virtual Private Network (VPN) services and other methods of obfuscating a user's identity. Rpt. of E.

---

[1] Mr. Jenco's report concerns his review of the affidavit of FBI Special Agent David Ogurek. Though the Government complains that Mr. Jenco did not review the affidavits submitted by Special Agent Kraft and Special Agent Joifrita, those affidavits contain the same factual allegations and support as the affidavit submitted by Special Agent Ogurek in support of the complaint. Thus, Mr. Jenco's criticisms are equally applicable to the affidavits submitted by both Special Agents Kraft and Joifrita.

Jenco (Doc. #98-1) at 15. In this case, the IP address in question leads to an entire region of Slovakia populated by hundreds of thousands of people. Rpt. of E. Jenco (Doc. #98-1) at 7–8.

Despite claiming there is probable cause linking Mr. Bill to the identified IP addresses, the affidavits do not identify any IP address that belongs only to Mr. Bill. That is because an IP address is merely an anonymous identifier which allows for the transfer of files and information between devices. IP addresses are not static identifiers that can be assumed to relate to only one particular device; they are dynamic, and they can be manipulated using VPN services, Tor networks, and another anonymizing services. Rpt. of E. Jenco (Doc. #98-1) at 7–8. Because of the inherently anonymous nature of IP addresses, IP tracking as a scientific method for connecting any online activity to a particular person is fundamentally flawed and unreliable. Rpt. of E. Jenco (Doc. #98-1) at 15. Yet the Affiants nonetheless recklessly relied upon such science in order to make the false claim that they had connected Mr. Bill to criminal activity on the Market.

Similarly, transactions and browsing history related to the use of Tor networks—often used in combination with VPN services—are specifically designed to mask user information. Such services allow users to route their internet traffic through intermediary services, effectively hiding their devices' true IP addresses and making it appear as though they are accessing the internet from a different location. Such obfuscation renders any conclusions drawn from such tracking wholly ineffective. Rpt. of E. Jenco (Doc. #98-1) at 7–8. As Mr. Jenco explains, any transactions which occur on Tor networks pass through a randomized combination of computer "nodes" before arriving at their destination computer. *Id.* at 9. The scrambling of transactions through these nodes makes it nearly impossible to track activity on Tor network websites to a genuine, specific IP address, let alone to a particular person, as the affidavits incorrectly claim.

Moreover, several people often share a single IP address, particularly when browsing the internet in public Wi-Fi hotspots or residential networks with Network Address Translation ("NAT") configurations. Rpt. of E. Jenco (Doc. #98-1) at 7–8. IP address tracking is therefore not a reliable method for tracking internet activity to particular individuals; instead, it is a faulty methodology whose effectiveness is hampered by widely available tools for IP address masking, which can be harnessed by anyone with a computer and basic technological literacy. Indeed, the technology supporting each of the warrants cannot even be used to determine whether a particular device was actually used to access a Tor network website or destination server.

At the very least, the Affiants should have known, based on their touted "training and experience," of the shortcomings of the methodologies they were relying upon in their attempts to establish probable cause. Affiants rely on little more than claims that IP addresses may be used to track anything and everything Mr. Bill does online. But there have been long been serious doubts as to the reliability of IP address tracking as a valid scientific method for law enforcement to track individuals. To rely upon such methods as a basis for the false claim that the agents had successfully connected Mr. Bill was reckless, dangerous, and a blatant abuse of Mr. Bill's constitutional rights. Employing this methodology without disclosing its limitations means their statements were made, at a minimum, with a "reckless disregard for the truth." *Franks*, 438 U.S. at 155–56.

### B. Contrary to the Claims of the Affidavits, the Agents' Methods Likewise Cannot Trace Criminal Activity to Mr. Bill Using "Clustering"

The Affiants also relied on a "clustering" methodology to supposedly trace cryptocurrency transactions relating to the Market to Mr. Bill. Rpt. of E. Jenco (Doc. #98-1) at 7. But just as IP address tracking is an unreliable method for tracing people online, so is clustering. "Clustering" is a method whereby agents identify groups of similar data points in a particular set of data. *Id.* But

clustering, like IP tracking, inherently relies upon heuristic assumptions that can easily be manipulated or misinterpreted. As Mr. Jenco explains, the ability to assign a particular cluster of transactions to a specific subject or entity has a reliability rate ***below 50% on the high end***. *Id.* Even at its very best, "at most it would demonstrate that Mr. Bill had unidentified repeated transactions with a person who is an administrator of the Kingdom Marketplace." *Id.* at 8. At its worst, clustering can be obfuscated by techniques like address ruse and the manipulation of transaction patterns to evade detection. Rpt. of E. Jenco (Doc. #98-1) at 15.

The Affiants' applications also ignore that Bitcoin, by its very nature, allows multiple users to control addresses within the same cluster, further complicating methods that attempt to track activity to a single user. Perhaps most critically, software like CoinJoin and other mixing services "break" the link between addresses, rendering clustering wholly ineffective. Rpt. of E. Jenco (Doc. #98-1) at 7–8. This is even more true with the Monero cryptocurrency, which Special Agent Kraft's affidavit admits the Market employs for online purchases. 12/14/23 Kraft Aff. ¶ 13. Monero was designed to address the privacy issues generated by ordinary Bitcoin transactions. Unlike Bitcoin, Monero uses several methods, such as ring signatures, hidden addresses, and confidential transactions to make it near impossible to locate the true sender. As a result, Monero transactions are, as its website advertises, "secure, private, [and] ***untraceable***."[2] Thus, it is even more doubtful that the Affiants could reliably connect any single transaction to Mr. Bill. as their affidavits claimed.

[2] *See* "What is Monero (XMR)?", https://www.getmonero.org/get-started/what-is-monero/ ("Monero transactions are confidential and ***untraceable***. . . . Monero is the only major cryptocurrency where every user is anonymous by default. The ***sender, receiver, and amount of every single transaction are hidden*** through the use of three important technologies: Stealth Addresses, Ring Signatures, and RingCT. Because every transaction is private, Monero ***cannot be traced***." (emphasis added).

Still, Special Agent Kraft's affidavit relentlessly attempted to attribute criminal activity to Mr. Bill using these suspect technological methods. The affidavit insisted that a payment Mr. Bill allegedly received must be "a withdrawal of a Kingdom administrator's proceeds because it is a large amount inconsistent with typical payments to vendors." 12/14/23 Kraft Aff. ¶ 38; 12/15/23 Kraft Aff. ¶ 39. Special Agent Kraft referred to these transactions as "unexplained cash deposits," insinuating ***both*** that these were illegal transactions merely because they were made using cryptocurrency, and that they were somehow tied to Mr. Bill. 12/14/23 Kraft Aff. ¶ 46. With absolutely no support for either of those assumptions, he suggested that every large financial transaction has the possibility of being criminal because it is "inconsistent" with whatever preconceived notions he had personally developed of what might by "typical" for unknown and anonymous users. Given their extensive "training and experience," however, it was especially reckless for Special Agent Kraft and the other Affiants to have relied so heavily upon two inadequate methodologies that are wholly incapable, at least at this point in their scientific development, of tracking anonymous online activity as his sole basis for searching the devices seized from Mr. Bill.

Using such suspect attribution methods alone means the Affiants' statements were made with a "reckless disregard for the truth." *Franks*, U.S. at 155–56. "Clustering," as explained above, often produces misleading results. Without additional corroborating evidence, which the Government as wholly failed to provide here, clustering shows little more than the fact that deposits occurred in an online wallet. Using such an untested, unreliable method to assert probable cause reflects a "reckless disregard" as to whether Mr. Bill had any genuine connection to the Market, much less unlawful transactions on that Market. By shrouding this pseudoscience in technical jargon, the Affiants misled the court by recklessly and inaccurately presenting their

unsubstantiated claims as if they were scientifically supported fact, when in fact their claims were based on nothing more than an inherently faulty methodology.

### III. Mr. Bill Has Shown That, Without the Inaccurate Statements, There Would Not Have Been Probable Cause Supporting the Warrants

Without the inaccurate statements described above, what is left to support the invasive search of Mr. Bill's email and the personal devices in his possession? Nothing of substance. Even accepting (contrary to fact) the truth of such statements, the Government's mere claim that Mr. Bill was associated in some way with the Market is not a sufficient basis to accuse him of engaging in any criminal transactions on the Market, as Mr. Bill has explained elsewhere. *See* Mot. to Dismiss (Doc. #196). Indeed, Special Agent Kraft admitted as much during this Court's suppression hearing only a few weeks ago. When asked whether "the mere fact that a person is associated with the administration of a website like Kingdom Market [is] enough to create reasonable suspicion that the person has themselves committed a crime," Special Agent Kraft answered "[t]hat fact alone, I don't believe so." Tr. (Doc. #192) at 184:10–14. When asked "if you had information that somebody had engaged in transactions in cryptocurrency, that would not constitute reasonable suspicion that they had engaged in a crime, right," Special Agent Kraft stated, "[t]hat's correct." Tr. (Doc. #192) at 180:24–181:2. Those recent acknowledgements directly contradict the claim in the warrant applications that there was probable cause to believe that Mr. Bill had engaged in criminal activity associated with the Market. And without its faulty analysis linking Mr. Bill to the Market, there is nothing more than innuendo to suggest that Mr. Bill had engaged in any criminal activity whatsoever.

The search warrants, which are held together by nothing more than incorrect claims based on pseudoscientific methodologies, fall apart once their statements about IP address tracking and clustering are removed. For example, Special Agent Kraft's affidavit requested a search of the

devices seized from Mr. Bill solely based on the idea that there was "probable cause to believe that things that were once stored on the Devices may still be stored there." 12/14/23 Kraft Aff. ¶ 86. That assertion, modest as it is, was based only on the inaccurate IP-address and clustering claims debunked above. When they are taken away, all is left in Special Agent Kraft's affidavit is a description of Mr. Bill's arrival at Newark in December 2023 and the barebones claim that Mr. Bill had potentially browsed the internet using Tor. 12/14/23 Kraft Aff. ¶¶ 21, 77–84.

These are hardly adequate grounds for a search warrant. In fact, the Government's own witness, Officer Arnab Mondal, answered "no" when asked whether it was "illegal to have Tor app on your phone." Tr. (Doc. #192) at 94:2-4. Officer Mondal also answered "no" when asked whether he had "any belief prior to [his] examination that [Mr. Bill] was attempting to smuggle in any kind of illegal drugs or other illegal goods." Tr. (Doc. #192) at 70:4–8. Special Agent Kraft admitted the same. Tr. (Doc. #192) at 93:12–15. Even ***with*** the inaccurate statements, the search warrants contain nothing more than generic allegations that Mr. Bill accessed the internet and potentially helped run a website. None of them contained any basis to believe that Mr. Bill had personally engaged in any unlawful drug transactions.

So what *is* left when the statements about probable cause and unreliable tracing methods are removed? Little more than, among other things, statements indicating that Market administrators received fees for deposits and withdrawals from the account. 12/14/23 Kraft Aff. ¶ 16, 12/8/23 Ogurek Aff. ¶¶ 30–31. But even if the Government had connected those fees to Mr. Bill (which, as explained above, they did not), the receipt of such fees say nothing about Mr. Bill's participation in any supposed criminal activity. Instead, at best the Affiants' statements alleged receipt of payments from an online marketplace which had regular transactions between anonymous customers. This is hardly a legitimate basis for an invasive search of the devices on

Mr. Bill's person upon his arrival to the United States. Thus, Mr. Bill has made the necessary preliminary showing that, if not for the false and misleading statements contained within them, there would not have been probable cause supporting the warrants, thereby entitling him to a *Franks* hearing.

## CONCLUSION

The Affiants' search warrants are propped up by nothing more than scientifically suspect evidence. Despite their extensive "training and experience," the Affiants have stretched anonymous IP addresses and clustering past their limits in an attempt to justify an unjustified search of Mr. Bill and the devices seized from his person. Mr. Bill, meanwhile, has gone far beyond what is required for him to be entitled to a *Franks* hearing. He has made a compelling showing shown that the search warrants contain numerous incorrect statements, and a substantial showing that the Affiants were at least reckless in making such unsupported claims to justify the warrant applications. Even more critically, as the Government's own witnesses have recently acknowledged, there was no reasonable suspicion (let alone probable cause) that Mr. Bill had personally engaged in criminal activity, as would have been needed to justify the search warrants the Affiants applied for. At the very least, this Court should require the affiants to testify in order to explain why they felt justified in seeking a warrant based on facts that they now acknowledge did not constitute reasonable suspicion of criminal wrongdoing, and why used scientifically debunked methods to insinuate Mr. Bill's connection to criminal activity. Mr. Bill—and this Court—are entitled to know the answers to those questions. For all those reasons, Mr. Bill respectfully requests that this Court hold a *Franks* hearing to determine the validity of the search warrants at issue.

Dated: April 1, 2025

Respectfully submitted,

BRYAN CAVE LEIGHTON
PAISNER LLP

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN, #60768MO
HANNAH WISSLER DEMAND, #74911MO
MADELINE A. DERANGO, #76595MO
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
*richard.finneran@bryancave.com*
*hannah.demand@bryancave.com*
*madeline.derango@bclplaw.com*

*Attorneys for Alan Bill*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of April, 2025, a true and correct copy of the foregoing document was served on counsel for Defendants via electronic mail.

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN