**THE UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:23 CR 714 RWS/NCC |
| | ) | |
| ALAN BILL, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY IN SUPPORT OF**
**DEFENDANT ALAN BILL'S SUPPLEMENTAL**
**BRIEF IN SUPPORT OF HIS REQUEST FOR A *FRANKS* HEARING**

The Government's Response (Doc. #226) only emphasizes what Mr. Bill argued in his opening memorandum: a *Franks* hearing is necessary to untangle the web of scientifically suspect evidence, false statements, and misrepresentations holding together the Government's entire case. In its most recent attempt to deflect attention away from its faulty warrants, the Government has done little more than double down on the defective affidavits filed by Special Agent Kraft and Special Agent Joifrita (the "Affiants"). But a cursory overview of those affidavits reveals why a *Franks* hearing is so necessary. *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).

As a threshold matter, each affidavit repeatedly and inaccurately portrayed the junk "science" of "clustering" ***as fact*** when it did not in fact reliability connect Mr. Bill to any illegal transactions, as the affidavits falsely claimed. It was at least reckless for the Affiants to aver under oath that such untested and unreliable methodology created the probable cause necessary to support such an invasive search of Mr. Bill's accounts and devices. But even more critically, the Government has done nothing to dispel Special Agent Kraft's own admission that, contrary to the

statements in his affidavit, there was no reasonable suspicion (much less probable cause) to believe that Mr. Bill had committed a crime at the time the warrants were obtained. There can therefore be no doubt that Mr. Bill has made the necessary showing that the Affiants made several inaccurate statements and, that without those statements, the invasive search warrants related to Mr. Bill's email and the devices in his possession would not have been supported by probable cause.

The Affiants' complete failure to present ***true*** facts supporting probable cause for each of the search warrants at issue—despite their allegedly extensive "training and experience"—combined with the litany of inaccurate statements propping them up, merits further examination by this Court. At the very least, the ensuing discrepancies should be investigated more thoroughly in a *Franks* hearing.

## DISCUSSION

### I. As the Government Now Acknowledges, the Affidavits Contain False Statements Regarding the Existence of Probable Cause

As Special Agent Kraft's recent testimony revealed, the Government had no evidence—and thus had no probable cause at the time of Mr. Bill's arrest on December 14, 2023—to support the assertion that Mr. Bill had committed a criminal offense. As Special Agent Kraft acknowledged under oath during Mr. Bill's suppression hearing, there was "no known information" at the time of Mr. Bill's arrest supporting a probable cause finding for any of the search warrants at issue. Tr. (Doc. #192) at 192:15–20. That admission directly contradicts the relevant affidavits, in which Special Agents Kraft and Joifrita claimed there was "probable cause to believe that Alan Bill . . . ha[d] committed violations of" numerous federal laws. 12/14/23 Kraft Aff. ¶ 5. Yet the Response (Doc. #226) makes no attempt to reconcile Special Agent Kraft's recent sworn testimony or his contemporaneous statements regarding the absence of any such "known information."

Instead, the Government now acknowledges that the affidavits supporting the invasive searches of Mr. Bill's email and the devices on his person contained false statements regarding the existence of probable cause. Each affidavit in this case claimed that Mr. Bill had personally committed violations of various provisions of Title 18 and Title 21, *see*, *e.g.*, 12/14/23 Kraft Aff. ¶ 3, which the Government now acknowledges it did not have evidence of at the time. The Government now claims it did not need to "prove" that Mr. Bill "was 'personally or physically' involved in drug trafficking" to obtain any one of the warrants at issue in this case. Resp. (Doc. #226) at 8–9. But that is precisely what the affidavits claimed to be true. *See id.* ("[T]here is probable cause to believe that Alan Bill . . . ha[s] committed violations of . . . 21 U.S.C. Sections 841 and 846."). The affidavits recite a number of alleged facts about Mr. Bill and the Market—but the only facts that even allegedly connecting the two together are the "clustering" allegations discussed in in Mr. Bill's opening memorandum and further discredited below. *See infra* § II. And the only thing those allegations even claim to do is connect Mr. Bill to the Market generally—not to any illegal drug transactions, as the affidavits falsely claimed.

As Special Agent Kraft has since acknowledged, the affidavits' claim that Mr. Bill was personally involved in drug transactions was false. Indeed, as he testified under oath, at the time of Mr. Bill's arrest, there was no evidence that Mr. Bill had "directly or physically" engaged in any illegal drug activity in the United States or elsewhere. Tr. (Doc. #192) at 192:15–20. Indeed, according to the draft letter addressed to port authorities Special Agent Kraft wrote immediately before Mr. Bill's arrest, there was "no known information which indicates that Bill is directly or physically involved in drug trafficking or terrorist activities." Tr. (Doc. #192) at 192:15–20. And even more importantly, at the suppression hearing, Special Agent Kraft testified that he believed that statement to be true at the time he wrote it. Tr. (Doc. #192) at 192:15–20. Without the

offending statements outlined in Mr. Bill's initial Post-Hearing *Franks* Briefing, *see* Supp'l Franks Brief (Doc. #221) at 1–11, the affidavits supporting the warrants at issue consist of little more than barebones claims that Mr. Bill served as an administrator for an online marketplace, which the Government itself acknowledges is not a crime in and of itself.[1]

But even worse, the Government did not even have any evidence that Mr. Bill was involved in an ***administrative*** capacity on the website at the time of arrest. According to Special Agent Kraft's affidavit, Mr. Bill, "***as a Kingdom administrator***, travels with electronic devices that enable him to facilitate Kingdom's continued operations and otherwise perform administrative functions." 12/14/23 Kraft Aff. ¶ 80 (emphasis added). But as the affidavit itself stated, those administrative functions continued even while Mr. Bill was traveling abroad. Indeed, once the devices on his person were seized at the airport, the Market nonetheless remained active and under moderation for several weeks after Mr. Bill's arrest. *Id.* Not only was there no evidence that Mr. Bill had carried contraband into the country, but there was also no evidence that Mr. Bill had "facilitate[d] Kingdom's continued operations and otherwise performe[d] administrative functions" during his travels, as the affidavits falsely claimed. 12/14/23 Kraft Aff. ¶ 80. The Affiants' reliance on such accusations at least arguably demonstrates a reckless disregard for the truth, warranting a *Franks* hearing on this issue.

[1] The Government continues to strawman Mr. Bill's argument regarding the insufficiency of the charges against him. Mr. Bill does not claim that "a darknet market administrator ***cannot, as a matter of law***, be criminally liable for any criminal transactions that occur on his website." Resp. (Doc. #226) at 8 (emphasis added). Mr. Bill does not claim such an immunity; rather, as he has exhaustively explained elsewhere, his alleged involvement as a "darknet market administrator" is not ***sufficient on its own*** to establish that such he has committed any violation of Title 21, as the Government's affidavits (and indeed, its indictments) have claimed. *See* Mem. in Supp. of Mot. to Dismiss (Doc. #197) at 5–6. Indeed, that basic principle is so obvious that even Special Agent Kraft agreed with it when he testified under oath. Tr. (Doc. #193) at 184:10–14.

Yet the Government claims that the affidavits are nonetheless valid because Officer Mondal discovered "Kingdom Market Telegram chats" on Mr. Bill's phone during the search. But that is insufficient for two reasons. First, as the Government's ***own photograph*** taken of Mr. Bill's phone on the day of his arrest reveals, the chats the Government relies on had not been opened or read since April 2023, more than eight months prior to Mr. Bill's arrest. Gov. Ex. 5, RealMe Phone Photo; Tr. (Doc. #192) at 204:4–15 (acknowledging that the most recent displayed chat had more than 1500 ***unread*** messages). Given that the account's user had last accessed those chats several months before Mr. Bill's arrest, this is not evidence that Mr. Bill had engaged in any criminal activity related to the Market. Indeed, the fact that the chats had been unopened for so many months further demonstrates the falsity of Special Agent Kraft's claim that Mr. Bill, "as a Kingdom administrator, travels with electronic devices that enable him to facilitate Kingdom's continued operations and otherwise perform administrative functions." 12/14/23 Kraft Aff. ¶ 80.

But second—and even more critically—the Government cannot retroactively claim the search warrants were valid merely because they "turned out right." Probable cause must exist ***prior*** to the search, not after the fact. *See Illinois v. Gates*, 462 U.S. 213, 227 (finding an "affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause" before a warrant may be issued); *see also United States v. Robinson*, 536 F.3d 874, 877 (8th Cir. 2008) (noting a "warrant is stale if probable cause no longer existed at the time the warrant was executed," as probable cause must exist before a warrant is issued). Since the information identified by Officer Mondal was not disclosed in the warrant applications, it cannot have formed part of the probable cause for their issuance.

## II. The Government Continues to Misrepresent the Junk Science Supporting Its Affidavits

Despite the demonstrable lack of probable cause supporting the warrants, the Government has now chosen to double down on its contention that the junk "science" which the Affiants relied upon is sound enough on its own to justify the search warrants in this case. But the Government greatly overstates the reliability and soundness of the methods described in the affidavits. The Government centers most of its argument on its contention that "blockchain analysis has been used in hundreds of successful criminal investigations and prosecutions." Resp. (Doc. #226) at 5. But the Government's argument breezes past Mr. Bill's actual arguments as the unreliability of the methods used in this case.

First, Mr. Bill does not claim that ***blockchain*** analysis is always wrong—nor does he need to in order to be entitled to a *Franks* hearing. Rather, Mr. Bill argues that a particular ***type*** of blockchain analysis—namely, ***clustering*** analysis—is unreliable. The mere fact that ***other*** forms of blockchain analysis have been admitted in other cases does not mean that the clustering analysis employed in this case must be accepted as reliable.

The Government also claims that Ms. Bisbee's report, which relies upon blockchain analysis to support her findings regarding the online interactions on the Market, remedies all its problems. Resp. (Doc. #225) at 6. But that claim is unpersuasive for two reasons. First, Ms. Bisbee's report was not presented to any magistrate judge as support for the warrants and therefore has no bearing on whether probable cause existed to support the search warrants at the time they were issued. *See supra* § I. Second, even considering it on its own terms, Ms. Bisbee's report is riddled with problems.

As the Government correctly notes, blockchain analysis is a broad methodology which includes the inspection, identification, clustering, and modeling of data gathered from a

cryptographic distributed-blockchain ledger in order to determine the location of an individual's cryptocurrency address. Resp. (Doc. #226) at 4. But as outlined in detail in Mr. Bill's initial *Franks* brief, ***clustering*** relies upon heuristic assumptions which can easily be manipulated or misinterpreted. Supp'l Franks Brief (Doc. #221) at 9–11. And as Mr. Jenco explained his expert report, the ability to assign a particular cluster of transactions to a specific subject or entity has a reliability rate ***below 50% on the high end***. Rpt. of E. Jenco (Doc. #98-1) at 7. "[A]t most it would demonstrate that Mr. Bill had unidentified repeated transactions with a person who is an administrator of the Kingdom Marketplace." *Id.* at 8. At its worst, the clustering analysis which the Government promotes can be obfuscated by techniques like address ruse and the manipulation of transaction patterns to evade detection. Rpt. of E. Jenco (Doc. #98-1) at 15. And yet, the Affiants presented the Government's clustering analysis as though it were a foolproof method of tying Mr. Bill to particular transactions—which, as Mr. Jenco's report explains, it most certainly was not. *See* Rpt. of E. Jenco (Doc. #98-1).

Second, it was misleading for the affidavits (and now, the Response) to claim that the clustering methodology was so strong as to permit a court to treat its findings as fact. Cryptocurrency, by its very nature, permits several users at once to control its addresses within a cluster, making it exceedingly difficult, if not impossible, to tie such transactions to a single user. Still, the Government claims that "every single one of the Bitcoin and Litecoin addresses identified through the Chainalysis Reactor tool were later discovered on the Kingdom Market servers." Resp. (Doc. #226) at 6. Again, the fact that the Government ***later*** develops corroboration for unsupported statements in an affidavit is irrelevant to the analysis under *Franks*. *See supra* § I. But even then, the fact that those addresses may have been later connected to the Market servers is hardly evidence that ***Mr. Bill*** engaged directly or physically in any illegal drug activity on the Market.

Rather, at best, the Government's *post hoc* evidence indicates that ***some user*** who accessed the Bitcoin wallet at issue had visited the Market. And because several users may control the addresses in a single cluster, such evidence cannot reliably establish that Mr. Bill was involved in any one of the transactions listed in the affidavits. As Mr. Bill's numerous submissions have explained, such "clustering" analysis often produces misleading results, and without additional corroborating evidence, which the Government has wholly failed to provide here, clustering shows little more than the fact that deposits occurred in an online wallet. Yet the affidavits presented such methods as a miraculous methodology for conclusively tracking every aspect of Mr. Bill's online activity. By falsely presenting the "clustering" claims of the Affiants as if they were ***facts*** establishing Mr. Bill's involvement in illegal transactions, the Affiants displayed a "reckless disregard for the truth" that demands a *Franks* hearing. *Franks*, 438 U.S. at 155–56.

## III. The Government Does Not Claim the Warrant Applications Are Otherwise Sufficient

The third element of *Franks* requires that Mr. Bill show that, without the offending statements, the warrants would not have been supported by probable cause. Tellingly, the Government's Response does not even attempt to dispute that proposition. *See generally* Resp. (Doc. #226). That is because, without the offending statements holding together the Affiants' warrant applications, there is nothing left to support the invasive search and seizure of Mr. Bill's email and the personal devices seized from him. For example, with respect to Special Agent Kraft's affidavit, when the inaccurate statements are removed, all that is left discussing Mr. Bill is a description of Mr. Bill's arrival at the airport and the claim that Mr. Bill browsed the internet using Tor. 12/14/23 Kraft Aff. ¶¶ 21, 77–84. It is clear, therefore, that these false statements were necessary to the probable cause finding in the Affiants' warrants.

Thus, Mr. Bill has made the "substantial preliminary showing" required to obtain a *Franks* hearing. He has made a sufficient preliminary showing that (1) that the Affiants provided inaccurate information in support of the search warrants; (2) that they did so with reckless disregard for the truth; and (3) that removal of those inaccuracies would undermine the finding of probable cause supporting the warrant. *Franks*, 438 U.S. at 155–56. Mr. Bill is therefore entitled to a *Franks* hearing.

## CONCLUSION

The Government's response to Mr. Bill's post-hearing *Franks* brief does nothing more than emphasize the insufficiency of the affidavits which form the foundation of the Government's case. Despite their extensive "training and experience," the Affiants could not identify a single piece of evidence which could meet the probable cause standard necessary to make the warrants valid, aside from those discredited above. As Special Agent Kraft himself admitted, the Affiants did not have any reasonable suspicion at the time the warrants were obtained to believe that Mr. Bill had been personally or directly involved in any illegal transactions. Instead, they relied upon clustering analysis—which is demonstrably unreliable—in an attempt to justify an unreasonable search of Mr. Bill and the devices seized from his person, based merely on an alleged connection to the Market itself. But such a methodology is unreliable, and it was reckless for the Affiants to portray the results of such analysis as if it conclusively tied Mr. Bill to any illegal transactions, when even the Government admits it did not.

Still, the Government attempts to course correct, claiming that flimsy evidence of unopened chat logs obtained ***after*** the search warrants were issued somehow meets the probable cause standard. But probable cause must be established ***before*** a search warrant is issued. As its own affiant has now acknowledged under oath, there was not even reasonable suspicion, let alone

probable cause, to believe that Mr. Bill had engaged in any illegal activity whatsoever, as would be necessary to authorize the warrants the Government wrongly obtained.

Mr. Bill has already gone far beyond what is necessary to entitle him to a *Franks* hearing. Mr. Bill has made the compelling showing that the search warrants contain numerous incorrect statements, and a substantial showing that the Affiants were at least reckless in making such unsupported claims to justify the warrant applications. For all those reasons, Mr. Bill respectfully requests that this Court hold a *Franks* hearing to determine the validity of the search warrants at issue.

Dated: May 12, 2025

Respectfully Submitted,

BRYAN CAVE LEIGHTON
PAISNER LLP

*/s/ Richard E. Finneran*
RICHARD E. FINNERAN, #60768MO
HANNAH WISSLER DEMAND, #74911MO
MADELINE A. DERANGO, #76595MO
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
*richard.finneran@bryancave.com*
*hannah.demand@bryancave.com*
*madeline.derango@bclplaw.com*

*Attorneys for Alan Bill*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of May, 2025, a true and correct copy of the foregoing document was served on counsel for Defendants via electronic mail.

Respectfully submitted,

*/s/ Richard E. Finneran*
Richard E. Finneran