UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:23-CR-714 CMS |
| | ) | |
| ALAN BILL, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

The matter is before the Court on Defendant Alan Bill's objections (Doc. 255) and the United States Attorney's objections (Doc. 253) to the Magistrate Judge's Report and Recommendation (Doc. 249).

All pretrial motions were referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b). In this complex case, Magistrate Judge Noelle C. Collins issued a carefully researched and thoroughly reasoned 140-page Report and Recommendation addressing various and sundry pretrial motions filed by Defendant and the United States.

The Government objects only to the portion of the Report and Recommendation granting in part Defendant's Motion to Suppress Evidence. The Government objects to the recommendation that certain statements of Defendant to federal agents be suppressed because Defendant was in custody and his waiver of *Miranda* rights was not knowing and intelligent. (Doc. 253 at 1-2). Defendant, for his part, objects to "each and every one of the Report's rulings and recommendations denying him the relief he requested in his pretrial motions." (Doc. 255 at 4).

1

This Court SUSTAINS, ADOPTS, AND INCORPORATES herein the Magistrate Judge's thorough findings of fact and recitation of the procedural history (Doc. 249 at 3-45). This Court also SUSTAINS, ADOPTS, AND INCORPORATES herein the Magistrate Judge's orders and recommendations denying: Defendant's Motion for Return of Property (Doc. 100); Defendant's Motions for Translation of Court Documents to Slovak (Docs. 69, 76); Defendant's Motion for Bill of Particulars (Doc. 99); Defendant's Motions to Dismiss Under Rule 48(b) (Docs. 76, 126, 143); Defendant's Motion to Dismiss for Failure to State an Offense, filed prior to the superseding indictment, (Doc. 131); Defendant's Motion to Dismiss for Failure to State an Offense (Doc. 196); and Defendant's Motion to Dismiss Count II for Multiplicity (Doc. 217). Those motions are DENIED.

This Court further SUSTAINS, ADOPTS, and INCORPORATES herein the Magistrate Judge's orders and recommendations granting Defendant's Motion for Admission into Evidence of Transcription and Translation of Recording (Doc. 213), and the Government's Motion for Determination that Defendant Has Failed to Make the Necessary Showing for a *Franks* Hearing (Doc. 118). Those motions are GRANTED.

Finally, this Court SUSTAINS, ADOPTS, and INCORPORATES herein the Magistrate Judge's recommendation denying in part Defendant's Motion to Suppress Evidence (Doc. 98). The Court does not adopt the recommendation granting in part Defendant's Motion to Suppress Evidence. For the reasons stated herein, Defendant's Motion to Suppress Evidence is DENIED in full.

# ANALYSIS

## Standard of Review

When a "party objects to the report and recommendation of a magistrate judge concerning a dispositive matter, '[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.'" *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (Bowman, J.) (quoting 28 U.S.C. § 636(b)(1)).

This Court has conducted a *de novo* review of the record, including the Magistrate Judge's Report and Recommendation, the transcripts, and the parties' motions, memoranda, and exhibits, and has conducted its own independent research.

## The Search by Customs and Border Patrol (CBP) Did Not Require Reasonable Suspicion or Probable Cause.

First, Defendant asks this Court to address his "distinct argument that his initial detention and the warrantless search and seizure of the devices in his possession" was not supported by either reasonable suspicion or probable cause. (Doc. 255 at 16). Because the detention of Defendant and the search of his laptop computer, cell phones, and thumb drive occurred at the border, the Government was permitted to conduct a suspicionless search of both Defendant and his devices.

"The Fourth Amendment protects against unreasonable searches and seizures." *United States v. Hamber*, 127 F.4th 1083, 1086 (8th Cir. 2025) (quoting *United States v. Allen*, 43 F.4th 901, 907 (8th Cir. 2022)). Generally, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

3

Searches and seizures at the border are one of those well-established exceptions. Searches made at the border "are reasonable simply by virtue of the fact that they occur at the border," *United States v. Ramsey*, 431 U.S. 606, 616 (1977), as the "government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border," *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). Since the Framing, Congress "has granted the executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to …. prevent the introduction of contraband into this country." *Id.* at 152-53 (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985)).

Searches conducted at the "functional equivalent of a border," such as an international port of entry at an airport, are no different.[1] *United States v. Udofot*, 711 F.2d 831, 839-40 (8th Cir. 1983). If the search does not extend "beyond the scope of a routine customs search and inspection," no degree of suspicion is required. *Montoya de Hernandez*, 473 U.S. at 541. A search of an international traveler's luggage is "within the scope of routine customs practice." *United States v. Oyekan*, 786 F.2d 832, 835-836 (8th Cir. 1986) (collecting cases). For example, CBP Officer Arnab Mondal testified at the suppression hearing that he routinely conducted 15 to 20 secondary inspections each day at the Newark airport. (Doc. 249 at 10).

Similarly, customs officers did not need any degree of suspicion to conduct a routine search of Defendant's electronic devices. "[G]iven the volume of travelers passing through our

---

[1] Defendant frequently relies on airport search-and-seizure cases involving passengers traveling on domestic flights. (Doc. 211 at 4) (citing *United States v. White*, 890 F.2d 1413, 1416 (8th Cir. 1989) (analyzing whether officers had reasonable suspicion to search a traveler arriving in St. Louis from Los Angeles)). Because domestic flights do not implicate the sovereign's "interest in preventing the entry of unwanted persons and effects" at the international border, *Flores-Montano*, 541 U.S. at 152, these cases are inapplicable.

4

nation's borders, warrantless electronic device searches are essential to the border search exception's purpose of ensuring that the executive branch can adequately protect the border." *Alasaad v. Mayorkas*, 988 F.3d 8, 17 (1st Cir. 2021). All circuits to consider the question have held that a routine search of a cellular device at the border may be conducted without any individualized suspicion.[2] *See id.* at 14; *United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019); *United States v. Touset*, 890 F.3d 1227 (11th Cir. 2018); *United States v. Castillo*, 70 F.4th 894 (5th Cir. 2023); *see also United States v. Xiang*, 67 F.4th 895, 901 (8th Cir. 2023) (recognizing this line of authority).

The legislative and executive branches are owed great deference in setting policy regarding, and policing, the border. The admission of a foreign national to the United States is "vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952); *see also United States v. Kolsuz*, 890 F.3d 133, 151 (4th Cir. 2018) (Wilkinson, J., concurring in the judgment) ("The role of courts is [ ] not to blanket the field of border searches by preempting constitutionally the contributions that the other two branches of our government are constitutionally empowered and uniquely positioned to make.").

The other two branches of government have granted customs officers broad authority to conduct searches of electronic devices at the border. Congress established CBP to "detect,

---

[2] An "advanced search" is "any search in which an Officer connects external equipment, through a wired or wireless connection, to an electronic device not merely to gain access to the device, but to review, copy and/or analyze its contents." CBP Directive No. 3340-049A, Border Search of Electronic Devices, § 5.1.4. A "routine" or "basic search" is any "border search of an electronic device that is not an advanced search." *Id.* at § 5.1.3.

respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States, in cases in which such persons are entering, or have recently entered, the United States.…" 6 U.S.C. § 211. By regulation, "[a]ll persons, baggage, and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection and search by a customs officer." 19 C.F.R. § 162.6. And a "basic search" of electronic devices, such as the one conducted here, may be conducted "with or without suspicion." CBP Directive No. 3340-049A, *Border Search of Electronic Devices.*

Like all international travelers, Defendant was subject to a primary immigration inspection and screening by CBP before entry into the United States. CBP Officers at ports of entry may permit an international traveler to enter the United States after completion of a primary inspection, or they may refer the traveler to a secondary inspection for additional screening. (Doc. 249 at 7). Here, CBP Officer Mondal approached Defendant and his wife during the primary inspection to escort them to the secondary inspection area, a large, open area next to a walkway where passengers exit to go to the baggage claim. There, CBP officers conduct secondary inspections of baggage and other items at a series of long tables. During Defendant's secondary inspection, other people were walking in the public areas and moving around freely. (Doc. 249 at 11).

Defendant argues his approximately two hours in the secondary inspection area rises at least to the level of a *Terry*-stop[3] requiring reasonable suspicion. But Defendant cites no applicable authority applying the *Terry*-stop rubric to such a border search. On the other hand, Congress has provided that "all persons coming into the United States from foreign countries

---

[3] *Terry v. Ohio*, 392 U.S. 1 (1968).

shall be liable to detention and search by authorized officers or agents of the government…" 19 U.S.C. § 1582. Considering the deference owed to the legislative and executive branches at the border and binding precedent, CBP officers required no degree of suspicion to refer Defendant to secondary inspection. *See, e.g.*, *Montoya de Hernandez*, 473 U.S. at 537 ("Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country.").

Defendant's argument that the border search exception applies only to searches targeting contraband is incorrect. The Eighth Circuit has made clear that the general assertion that "the Fourth Amendment does not permit border searches for mere evidence of criminal activity was rejected by the Supreme Court over fifty years ago." *Xiang*, 67 F.4th at 900 (citing *Warden v. Hayden*, 387 U.S. 294, 300-302 (1967)). Because the Government has an established "interest in preventing crime at international borders… it follows that a search for evidence of either contraband or a cross-border crime furthers the purposes of the border search exception to the warrant requirement." *Alasaad*, 988 F.3d at 20.

### Reasonable Suspicion Supported the Search.

Despite that reasonable suspicion was unnecessary for the search of Defendant's electronic devices, reasonable suspicion nonetheless existed here. "Reasonable suspicion exists when, considering the totality of the circumstances known to the officer at the time, the officer has a particularized and objective basis for suspecting wrongdoing." *United States v. Schaefer*, 64 F.4th 1004 (8th Cir. 2023) (quoting *United States v. Hamilton*, 591 F.3d 1017, 1022 (8th Cir. 2010)). Although the concept of reasonable suspicion is "somewhat abstract," evaluating the

relevant facts in "isolation from each other does not take into account the 'totality of the circumstances.'" *United States v. Arvizu*, 534 U.S. 266, 274 (2002).

Here, CBP Officer Mondal was aware that Defendant and his alleged dark web marketplace, KingdomMarket, were the subjects of a "lookout alert." (Doc. 249 at 10). The alert referred to KingdomMarket as a prevalent marketplace on the dark web, "which facilitates the sale of illicit narcotics, stolen identities, counterfeit currency, fraudulent documents, et cetera. These marketplaces are often used by members of drug trafficking organizations (DTO) and transnational criminal organizations (TCO) to conduct nefarious activities." (Doc. 249 at 10). Defendant also was visibly nervous. He was "sweating from his face," "shifting his weight," and "rocking back and forth" while talking to Officer Mondal during the secondary inspection. *See United States v. Pacheco*, 996 F.3d 508, 513 (8th Cir. 2021) (acknowledging that a defendant's "unusual or extreme nervousness" is a factor in the reasonable-suspicion calculus).

For these reasons, the search of Defendant's electronic devices falls squarely within well-established precedent dictating that such border searches do not violate the Fourth Amendment. Defendant's Motion to Suppress Evidence on this ground is denied.

## **Defendant's Statements During the Secondary Inspection Will Not Be Suppressed.**

Second, Defendant asserts that all the statements he uttered after he was referred to secondary inspection should be suppressed because the statements were obtained in violation of his Fifth Amendment right against self-incrimination. (Doc. 211 at 13). Because Defendant was in custody once he was referred to secondary inspection, Defendant argues, all his responses to any CBP questions from this point on required a valid waiver of his *Miranda* rights. But, for the reasons stated below, Defendant was not in custody until he was arrested at the end of his

8

interview with federal agents. All of Defendant's statements uttered during the secondary inspection therefore are not to be suppressed.

### *Miranda* Generally

The "Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). The "now familiar *Miranda* warnings" require that a defendant "be informed 'that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires'—or their equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 297 (1980) (quoting *Miranda*, 384 U.S. at 479).

*Miranda* warnings are required only when police officers interrogate a defendant in custody. *United States v. Bailey*, 831 F.3d 1035, 1038 (8th Cir. 2016). "Ordinarily, 'the ultimate question in determining whether a person is in "custody" for purposes of *Miranda* is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."'" *United States v. Turner*, 125 F.4th 892, 896 (8th Cir. 2025)(quoting *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)). "This is an objective determination considered from the perspective of a reasonable person in the suspect's position." *United States v. Sanchez-Velasco*, 956 F.3d 576, 580 (8th Cir. 2020) (citing *Stansbury v. California*, 511 U.S. 318, 322-23 (1994)). At bottom, the "custody inquiry turns on whether, under the totality of the circumstances, an objectively reasonable person in the suspect's position would have felt free to terminate the interrogation and leave." *Turner*, 125 F.4th at 896.

9

A determination of whether a defendant is in "custody" for *Miranda* purposes focuses on the "six non-exclusive factors," *Sanchez-Velasco*, 956 F.3d at 580, listed in *United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990):

> (1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;
> (2) Whether the suspect possessed unrestrained freedom of movement during questioning;
> (3) Whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;
> (4) Whether strong arm tactics or deceptive stratagems were employed during questioning;
> (5) Whether the atmosphere of the questioning was police dominated; or,
> (6) Whether the suspect was placed under arrest at the termination of the questioning.

Even then, "'[c]ustody' cannot be resolved merely by counting up the number of factors on each side of the [*Griffin*] balance and rendering a decision accordingly." *Czichray*, 378 F.3d at 827. In the end, the "ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *Id.* at 828; *see also United States v. LeBrun*, 363 F.3d 715, 719-24 (8th Cir. 2004) (*en banc*) (resolving the question of custody without relying on *Griffin*'s six non-exhaustive factors).

In addition to the custody requirement, the Fifth Amendment's right against self-incrimination (and the need for a waiver of *Miranda* rights) also requires a second ingredient: interrogation. "Interrogation occurs only when there is express police questioning or its 'functional equivalent,' which means 'words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Bailey*, 831 F.3d at 1038 (quoting *Innis*, 446 U.S. at 300–301 (emphasis removed)). Because spontaneous statements do not result from interrogation, these statements are admissible with or without *Miranda* warnings. *See United States v. McGlothen*, 556 F.3d 698, 701 (8th Cir. 2009).

10

Further, not all police questioning or its "functional equivalent" constitutes "interrogation" for *Miranda* purposes. "[R]outine booking question[s]," such as those questions necessary to "secure the biographical data necessary to complete booking or pretrial services," "fall outside the protections of *Miranda*." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (citation and quotation omitted).

### Defendant Was Not In Custody During the Secondary Inspection.

Again, the "custody inquiry turns on whether, under the totality of the circumstances, an objectively reasonable person in the suspect's position would have felt free to terminate the interrogation and leave." *Turner*, 125 F.4th at 896. In assessing whether custody exists, then, a court must evaluate "the circumstances surrounding the interrogation." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

Not every encounter with law enforcement, even when a suspect is briefly detained, is custodial. For example, traffic stops generally are not custodial. *See Berkemer v. McCarty*, 468 U.S. 420, 437 (1984). In reaching this conclusion, the Supreme Court in *Berkemer* acknowledged "at the outset that a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle" and is therefore a Fourth Amendment seizure. *Id.* at 436-37 (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). Still, the Supreme Court declined to find that traffic stops generally are custodial because the ordinary traffic stop is "presumptively temporary and brief" and the "atmosphere surrounding [the stop is] substantially less 'police dominated'" than the settings of prior *Miranda* cases. *Id.* at 438-39.

More specifically, *United States v. FNU LNU*, 653 F.3d 144 (2d Cir. 2011), is instructive in evaluating custody at the international border. There, the defendant arrived on an international flight to New York City under the name "Sandra Calzada." *Id.* at 146. A CBP officer found that

11

name on a list of outstanding NYPD warrants. *Id.* Upon her arrival at the airport, the defendant was escorted to a secondary inspection room for further questioning by an armed guard. *Id.* The defendant then presented a passport bearing the name "Sandra Calzada," and the officer asked the defendant her name, her citizenship, and where and when she was born. *Id.* After running the defendant's fingerprints and discovering that a previous passport depicted someone else, the CBP officer again asked about the defendant's background. *Id.* at 146-47. The defendant was unable to relate any of Sandra Calzada's family history or identify her prior addresses. *Id.* at 147. Ninety minutes after the defendant was referred for secondary inspection, the CBP officer took the defendant to another CBP officer, and the defendant was later deemed "inadmissible" and held over for an immigration hearing. *Id.*

The Second Circuit held that the defendant was not in custody throughout her secondary inspection. *Id.* at 155. After recounting a set of custody factors analogous to the *Griffin* factors, the Second Circuit noted that a "reasonable person's expectations about how the questioning is likely to unfold are also relevant." *Id.* at 154. The court analogized a CBP secondary inspection to the *Berkemer* Court's view of a traffic stop, as both situations involve "compulsory questioning" with "no freedom" to leave without answering an officer's questions. *Id.* at 153. Like a driver asked pedigree questions at a traffic stop, a reasonable foreign traveler "will expect some constraints as well as questions and follow-up about his or her citizenship, authorization to enter the county, destination, baggage, and so on." *Id.* at 153-54.

The logic of the *FNU LNU* court is persuasive[4] and is in accordance with the constitutional prerogatives of the legislative and executive branches in assuring border security.

---

[4] Other circuits have found that *Miranda* warnings are not required in a secondary inspection "unless and until the questioning agents have probable cause to believe that the person questioned has committed an offense, or the person questioned has been arrested, whether with

12

For these reasons, the Court agrees that "secondary inspection is not innately custodial[.]" *United States v. Fernandez-Ventura*, 132 F.3d 844, 847 (1st Cir. 1998).

Further, every *Griffin* factor—in addition to those identified in *FNU LNU*–supports a finding that Defendant's relatively brief time in secondary inspection was not custodial.

First, Officer Mondal's inquiry during the secondary inspection amounted to standard admissions questions. Officer Mondal asked Defendant about his occupation, his travel plans, and ownership of his devices. (Doc. 249 at 12-14). A reasonable traveler in Defendant's place would not have felt that he was in "custody" from the nature of these questions. *FNU LNU*, 653 F.3d at 154.

Defendant may not have been "free to leave" the secondary inspection area. But, as in *FNU LNU*, Defendant, a foreign national seeking admission to the United States, voluntarily "submitted to some degree of confinement and restraint by approaching the border." *FNU LNU*, 653 F.3d at 153; *see also Berkemer*, 468 U.S. at 437 ("A motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way."). In other words, Defendant and other foreign travelers may not be "free to leave" during a

---

or without probable cause." *Chavez-Martinez v. United States*, 407 F.2d 535, 539 (9th Cir. 1969); *United States v. Galloway*, 316 F.3d 624, 631 (6th Cir. 2003). This analysis improperly focuses on an arresting officer's knowledge: "To determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 583 U.S. 48, 56-57 (2018) (citations and quotations omitted). As stated above, the "custody inquiry turns on whether, under the totality of the circumstances, an objectively reasonable person in the suspect's position would have felt free to terminate the interrogation and leave." *Turner*, 125 F.4th at 896. The holdings of *Chavez-Martinez* and *Galloway* focus on the perspective of the wrong actor.

secondary inspection, but that comports with their reasonable expectations regarding the "routine airport security procedures" to which they avail themselves. *Galloway*, 316 F.3d at 631; *see also FNU LNU*, 653 F.3d at 153-54 (noting that "the traveler has voluntarily submitted to some degree of confinement and restraint by approaching the border"). Thus, regardless of Officer Mondal's testimony that, in his mind, Defendant was "not free to leave the CBP area," (Doc. 249 at 12), any reasonable traveler in Defendant's position would have expected that to be the case.

Defendant also had unrestrained freedom of movement during questioning. Throughout the secondary inspection, Defendant was never restrained to "the degree associated with formal arrest." *United States v. Laurita*, 821 F.3d 1020, 1024 (8th Cir. 2016) (quoting *United States v. Williams*, 760 F.3d 811, 815 (8th Cir. 2014)). In fact, nothing in the record suggests that Defendant was formally restrained in any way.

CBP officers did not use any "strong arm tactics or deceptive stratagems" to question Defendant during the secondary inspection. While Officer Mondal did not tell Defendant about the lookout alert or the fact that a baggage check of Defendant's luggage would occur during the secondary inspection, (Doc. 249 at 11), he also did not threaten Defendant in any way. Nor is there any indication in the record that Officer Mondal's encounter with Defendant was anything but cordial.

The atmosphere of the secondary inspection was not police-dominated. "The question is whether the entire context of the questioning, including such considerations as place and length of the interrogation, demonstrates that the course of the investigation was police dominated." *Griffin*, 922 F.2d at 1352. The secondary inspection took place in a "large, open area next to a walkway where people can exit to go to baggage claim." (Doc. 249 at 11). At the time of Defendant's secondary inspection, other travelers continued to walk freely in the nearby public

14

areas. (Doc. 249 at 11). Officer Mondal was the only officer visible to Defendant during the secondary inspection. (Doc. 249 at 11). The secondary inspection of Defendant, his luggage, and his devices lasted approximately two hours. Certainly, a reasonable foreign traveler in Defendant's position would understand that the customs process—and by extension, the secondary inspection process—may result in some degree of extended delay. *See United States v. Moya*, 74 F.3d 1117, 1120 (11th Cir. 1996) ("[B]ecause of the sovereign's responsibility, some degree of questioning and of delay is necessary and is to be expected at entry points into the United States."). A two-hour inspection of a foreign traveler's luggage and devices is not unduly lengthy, such that a reasonable foreign traveler would believe he was in custody.[5]

Defendant was not placed under arrest at the conclusion of the secondary inspection. In fact, Officer Mondal released Defendant, his wife, and their baggage from the secondary inspection area through the door leading to the public international concourse, though Officer Mondal retained Defendant's electronic devices. (Doc. 249 at 16, 128).

In sum, the totality of the circumstances supports the conclusion that Defendant was not in custody during the secondary inspection at the Newark airport. To the extent Defendant's Motion to Suppress Evidence seeks suppression of his statements during the secondary inspection, the motion is denied.

### **Defendant's Statements During His Interview Will Not Be Suppressed.**

As Defendant and his wife sat in a public area of the Newark airport, five investigators approached them. CBP Task Force Officer Richard Moses and FBI Special Agent David Ogurek asked Defendant to accompany them to a CBP conference room for questioning. (Doc. 249 at 20-

---

[5] Vastly longer interrogations have been held not *per se* custodial. *See United States v. Czichray*, 378 F.3d 822 (8th Cir. 2004) (finding that the defendant was not in custody during a seven-hour interview).

21). Defendant and his wife agreed to go with them. They walked down a hallway and through several doors requiring keycard access to a conference room in a secured area adjacent to the open secondary inspection area. (Doc. 249 at 21). There, Defendant was interviewed by Agent Ogurek and HSI Special Agent Nolan Kraft.

**Defendant Was Not In Custody Until the End of the Interview.**

Defendant argues he was in custody during his interview with Agents Ogurek and Kraft. The Government consistently has disputed that Defendant was in custody at this time. (Docs. 139 at 25-28; 220 at 25-26; 253 at 3-4). For reasons similar to those discussed above, Defendant was not in custody until he was placed under formal arrest at the conclusion of this interview.

First, though the agents apparently did not tell Defendant he was free to leave or that he could terminate questioning at any time, they also did not tell Defendant that he was under arrest. Nothing in the record indicates that Defendant was told that he could not stop questioning at any time or that the officers refused to stop questioning Defendant. *See Laurita*, 821 F.3d at 1024 ("Although they did not expressly tell Laurita his participation was voluntary or that he was free to leave, nothing about the circumstances or the investigators' actions indicated otherwise."). And even though a translated statement informed Defendant, "you are going to stay," this statement also informed Defendant that his wife was allowed to leave. (Doc. 229-1 at 8).

Defendant's freedom of movement was not significantly restrained during the interview in the CBP conference room. Defendant was interviewed in a 30 by 50 foot room, and the door to the hallway remained open. (Doc. 249 at 21). An adjacent holding cell with a bathroom was situated next to the conference room. (Doc. 249 at 21). During the interview, the agents allowed Defendant to use the bathroom connected to the conference room. (Doc. 249 at 22). *Cf. United States v. Axsom*, 289 F.3d 496, 501 (8th Cir. 2002) (reasoning that an agent escorting the

16

defendant to the bathroom cut against a finding that the defendant possessed unrestrained

freedom of movement). Defendant was not "handcuffed, physically or verbally restrained, or

otherwise confined" until the conclusion of the interview. *Laurita*, 821 F.3d at 1025 (citing

*United States v. Cowan*, 674 F.3d 947, 957 (8th Cir. 2012)).

Defendant voluntarily acquiesced to this further questioning at the request of the agents.

CBP Task Force Officer Moses and Agent Ogurek approached Defendant in a public area of the

Newark airport and asked, "Hey, we have some questions that we'd like to talk to you about. Can

you come with us?" (Doc. 193 at 208). Defendant nodded, stood up, and followed them to the

CBP conference room. (Doc. 193 at 209). Although the agents did not inform Defendant that he

could terminate questioning before reading Defendant his *Miranda* rights, Defendant did not

attempt to terminate questioning at any point. *See United States v. Czichray*, 378 F.3d 822, 829

(8th Cir. 2004) ("This is not a case where a suspect sought to exercise his option of terminating

the interview, only to meet resistance from his interrogators.").

As with the secondary inspection, the agents did not use any "strong arm tactics or

deceptive stratagems" during this portion of their investigation. To be sure, the agents did tell

Defendant that his friend "Michal" had gotten Defendant "into a world of trouble."[6] (Doc. 213-2

at 11). The agents also referenced Ross Ulbricht during the interview.[7] (Gov't Ex. 10 at 1:45:28).

But the "coercive aspects of a police interview are largely irrelevant to the custody determination

---

[6] Earlier in the interview, Defendant claimed that "Michal Žiak" owned the "company computer" possessed by Defendant as he entered the United States. (Doc. 211-1 at 1-2). Agent Ogurek stated, "Michal, your friend, you claim is the mastermind behind the Kingdom Market that you know nothing about, has got you into a world of trouble." (Doc. 211-1 at 11).

[7] Ross Ulbricht was convicted of "drug trafficking and other crimes associated with his creation and operation of Silk Road, an online marketplace whose users primarily purchased and sold illegal goods and services." *United States v. Ulbricht*, 858 F.3d 71, 82 (2d Cir. 2017), *overruled by Carpenter v. United States*, 585 U.S. 296 (2018). Ulbricht was sentenced to life imprisonment. *Id.*

except where a reasonable person would perceive the coercion as restricting his or her freedom

to depart." *LeBrun*, 363 F.3d at 721. It "is appropriate for an investigator to advise a suspect of

the potential course and consequences of a criminal investigation," and such information "does

not tend to restrain a person's freedom of movement such that he should be deemed in custody."

*Czichray*, 379 F.3d at 829. Moreover, the agents' references to "Michal" were responsive to

Defendant's claims that his friend "Michal" was responsible for operating KingdomMarket.

 The atmosphere was not police dominated. Neither of the agents displayed a weapon.

Only two of the five investigators who escorted Defendant to the CBP conference room

interviewed Defendant. Nor does the location of Defendant's interview cut in favor of a finding

that the atmosphere was police-dominated. Most police interviews will take place behind closed

doors. "*Miranda* warnings need not be imposed simply because the questioning takes place in a

police station" or a functional equivalent. *United States v. Galceran*, 301 F.2d 927, 931 (8th Cir.

2002) (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)); *see also United

States v. Mottl*, 946 F.2d 1366, 1370 (8th Cir. 1991) (holding that interview of suspect at FBI

headquarters did not take place in a police dominated atmosphere).

 The agents did remove Defendant's wife from the conference room during the interview.

*Griffin* itself states that a "frequently recurring example of police domination concerns the

removal of the suspect from the presence of family, friends, or colleagues who might lend moral

support during the questioning and deter a suspect from making inculpatory statements, an

established interrogation practice noted by the *Miranda* court." *Griffin*, 922 F.2d at 1353. But in

this unique circumstance—*i.e.*, with a suspect who allegedly cannot speak English and a spouse

who can—a reasonable person would understand that a spouse may not be a suitable translator

for a police interview. Unlike a third-party translator, a wife may be inclined to alter or omit

18

significant portions of her interviewee husband's statements for either her own or her husband's benefit.

Finally, Defendant was placed under arrest at the conclusion of the interview. This factor weighs in favor of a finding that Defendant was in custody during the interview. *But see United States v. Treanton*, 57 F.4th 638, 641 (8th Cir. 2023) ("Some of our cases have said that an arrest at the end of questioning is an indicium of custody. It is not clear why that should be so when the suspect does not know that an arrest is forthcoming: custodial status depends on whether a reasonable person would feel free to leave during the interview.") (internal citation omitted).

The balance of the totality of the circumstances suggests that Defendant was not in custody until he was arrested at the end of his interview. "The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *Czichray*, 378 F.3d at 828. In the unique border context, "the government has more latitude to detain persons[.]" *United States v. Butler*, 249 F.3d 1094, 1100 (9th Cir. 2001) (quoting *United States v. Doe*, 219 F.3d 1009, 1014 (9th Cir. 2000)). Here, a reasonable foreign national presenting for admission to the United States has objectively different expectations as to what constitutes "formal arrest" than a person in a different context away from the border. The lack of physical restraints, the lack of force, Defendant's acquiescence to the interview, and Defendant's relative freedom of movement all point to the same conclusion: Defendant was not in custody until he was formally arrested at the conclusion of the interview.

### Even If Defendant Was In Custody During the Interview, He Knowingly, Voluntarily, and Intelligently Waived His *Miranda* Rights.

A defendant may waive his *Miranda* rights, permitting police to engage in a "custodial interrogation." The government must show by a preponderance of the evidence that the

defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *see also Lego v. Twomey*, 404 U.S. 477 (1972).

"The inquiry has two distinct dimensions." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citing *Edwards v. Arizona*, 451 U.S. 477, 482 (1981); *Brewer v. Williams*, 430 U.S. 387, 404 (1977)). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. "Only if the 'totality of the circumstances surrounding the interrogation' reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

*Defendant Knowingly and Intelligently Waived his* Miranda *Rights.*

First, Defendant knowingly and intelligently waived his *Miranda* rights.  A signed advice-of-rights form "'alone carries significant weight in determining whether his waiver was knowing and intelligent.'" *United States v. Rooney*, 63 F.4th 1160, 1168 (8th Cir. 2023) (quoting *United States v. Gallardo*, 495 F.3d 982, 991 (8th Cir. 2007)). Though Defendant signed the *Miranda* form after it was translated for him from English to Czech, he now argues that he did not fully understand the contents of the form because he does not understand English and the form was mistranslated.

This Court finds the record to be quite clear that Defendant understands, and can speak, read, and write, the English language. Defendant communicated with Officer Mondal at the airport in English. (Doc. 249 at 12). Officer Mondal asked Defendant "declarative questions"

20

that Defendant answered in English. (Doc. 249 at 12). Defendant told Officer Mondal that he was "staying in the United States for four or five days with plans to travel to South America for his honeymoon." (Doc. 249 at 12). Defendant also told Officer Mondal, in English, that he worked as an IT specialist and owned a window cleaning company. (Doc. 249 at 12).

Defendant further complied with Officer Mondal's directives in English. Defendant agreed to let Officer Mondal search his baggage, provided Officer Mondal with the passcodes to his electronic devices, and emptied his pockets when asked. (Doc. 249 at 12). There was no translator present during these exchanges. In short, Defendant demonstrated that he was conversant in English.

Additionally, Defendant has filed documents with this Court that indicate he can read and write English. A court may take judicial notice of its own records and files. *United States v. Jackson*, 640 F.2d 614, 617 (8th Cir. 1981) (quoting *United States v. Damato*, 554 F.2d 1371, 1373 (5th Cir. 1977)). On February 25, 2024, Defendant filed his "Opposition to Government's Motion for Findings of Fact and Complex Case Designation." (Doc. 57). The motion is written in English and contains legal analysis responsive to the Government's motion. (Doc. 57 at 7) ("While in custody[,] Defendant was subject to extreme forms of humiliation, pressure, undue influence and duress by FBI agents in order to admit to crimes, that he has not committed."); (Doc. 57 at 9) ("It is interesting to note, that the detention facility, where Defendant is detained does not have proper technical equipment for the Defendant to review evidence filed by the Plaintiff."); (Doc. 57 at 9) ("The Government has failed to file any evidence proving Defendant's guilt and instead the Government has untimely filed documents totally unrelated to Defendant's case."). Defendant signed this legal pleading himself, representing to the Court that he personally authored it. (Doc. 57 at 10).

21

Additionally, Defendant attached two exhibits containing his English language communications with one of his former lawyers. Defendant wrote, "I, Alan Bill, hereby certify under penalty of perjury that folowing statement is true and nothing but the true. ln past days, I was pressure on multiple occasions by former lawyer to agree to motion to continue and for complex case determination. My former attorney had for unknown reasons exercised duress so I would agree to the motion. I was also threatened in order to agree to that motion. I object to any continuance granted to the prosecutor." (Doc. 57, Ex. A) (grammatical errors in original). Defendant's lawyer responded to Defendant in English that he would be withdrawing from Defendant's case, and Defendant saw fit to attach that English language communication as well. (Doc. 57, Ex. B).

In sum, Defendant understands English.[8] It stands to reason, then, that Defendant understood the *Miranda* form given to him by the agents. Even if Defendant could not read English, he certainly would have understood the contents of the form through the translation process from English to Czech. When the agents had difficulty locating a Slovak interpreter, Defendant volunteered that he understood Czech. (Doc. 249 at 21-22). Czech and Slovak are similar languages, with approximately an 80 percent overlap. (Doc. 249 at 24).

The translator, Zuzana Arata, a certified Czech and Russian linguist and translator for the FBI, was not physically present and did not have a copy of the form. Therefore, in Defendant's presence, Agent Ogurek read the form aloud in English, and Ms. Arata translated the form to Defendant in Czech via telephone. (Doc. 249 at 24-26). Given that Defendant does not allege that the executed *Miranda* form was somehow deficient, his execution of the form "carries

---

[8] The Court, in its discretion, nonetheless has provided Slovak interpretation services to Defendant at the insistence of Defendant and defense counsel. *See United States v. Coronel-Quintana*, 752 F.2d 1284, 1291 (8th Cir. 1985).

significant weight" that his waiver was knowing and intelligent. *Rooney*, 63 F.4th at 1168 (quoting *Gallardo*, 495 F.3d at 991).

Even if Defendant did not understand English (the record dictates that he does), the Czech translation of the *Miranda* form was sufficient for Defendant to knowingly and intelligently waive his *Miranda* rights.

"'The "rigidity" of *Miranda* does not extend to the precise formulation of the warnings given a criminal defendant' and no 'talismanic incantation is required to satisfy its strictures.'" *Duckworth v. Eagan*, 492 U.S. 195, 202-203 (1989) (quoting *California v. Prysock*, 453 U.S. 355, 359 (1981) (per curiam)) (citation modified). "In determining whether police officers adequately conveyed the four warnings, [ ] reviewing courts are not required to examine the words employed as 'if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*.'" *Florida v. Powell*, 559 U.S. 50, 60 (2010) (quoting *Duckworth*, 492 U.S. at 203)) (citation modified).

Ms. Arata, translating the *Miranda* form, stated the following to Defendant in Czech:

You have the right to remain silent.
Anything you say can be used against you in the court.
You can have an attorney present with you when they are asking you questions.
If you cannot afford an attorney one will be appointed for you before questioning.
If you decide to answer to our questions you can stop the interview at any time,
and then consult an attorney if you wish.

(Doc. 229-1, Ex. A at 9).

These five statements substantively match, and in some ways exceed, *Miranda*'s four warnings: "A suspect must be warned prior to any questioning (1) that he has the right to remain silent, (2) that anything he says can be used against him in a court of law, (3) that he has the right to the presence of an attorney, and (4) that if he cannot afford an attorney one will be appointed

23

for him prior to any questioning if he desires." *Powell*, 559 U.S. at 59-60 (quoting *Miranda*, 384 U.S. at 479) (citation modified).

To the extent Ms. Arata failed to translate directly from the *Miranda* form, any omission is immaterial to the substance of the given *Miranda* warnings.[9]  Defendant fails to cite any authority to support his argument that omission of the word "waiver" from the translation made an otherwise valid *Miranda* waiver defective. In fact, Ms. Arata informed Defendant that the agents could not interrogate Defendant without his "consent" – the "functional equivalent" of "waiver."

### *Defendant Voluntarily Waived His* Miranda *Rights.*

Second, Defendant voluntarily waived his *Miranda* rights. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." *LeBrun*, 363 F.3d at 724 (quoting *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001)). A court evaluates whether a "defendant's will has been overborne by examining the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure." *United States v. Magallon*, 984 F.3d 1263, 1284 (8th Cir. 2021) (quoting *United States v. Brave Heart*, 397 F.3d 1035, 1040 (8th Cir. 2005)).

---

[9] In full, the CBP *Miranda* form states:
Before we ask you any questions, it is my duty to advise you of your rights.
You have the right to remain silent.
Anything you say can be used against you in a court of law or other proceedings.
You have the right to consult an attorney before making any statements or answering my questions.
You have the right to have an attorney present with you during questioning.
If you cannot afford an attorney one will be appointed for you before questioning, if you wish.
If you decide to answer questions now, you still have the right to stop questioning any time or stop the questioning for the purpose of consulting an attorney.
(Doc. 229-1 at 9).

Factors to consider include "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." *Id.* (quoting *United States v. Boslau*, 632 F.3d 422, 428 (8th Cir. 2011)). "Tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices, do not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne." *Id.* (citing *Brave Heart,* 397 F.3d at 1041) (citation modified).

The length of the actual interview—approximately 90 minutes—did not render Defendant's waiver of his *Miranda* rights involuntary. While there is no bright-line for when an interrogation becomes coercive because of its length, substantially longer interrogations have been held not *per se* involuntary. *See United States v. Deghani*, 550 F.3d 716, 720 (8th Cir. 2008) (interrogation lasted around five and a half hours); *Jenner v. Smith*, 982 F.3d 329, 334 (8th Cir. 1993) (interrogation lasted around six to seven hours).

The record reveals that Defendant is of at least average intelligence and has demonstrated familiarity with the American legal system. In general, the Eighth Circuit has concluded that "where the defendant possessed at least average intelligence, then his inculpatory statements were not compelled." *LeBrun*, 363 F.3d at 726. Defendant represented to investigators that he was an IT specialist and owned a window cleaning company. (Doc. 249 at 12). In other words, Defendant is sufficiently intelligent to engage in a highly skilled occupation and to own his own business. *See LeBrun*, 363 F.3d at 726 (noting that the defendant worked as a manager in a real estate office). Defendant also appeared well-versed in cryptocurrency, such that he understood English terms without the need for a translator. *See United States v. Deghani*, 550 F.3d 716, 720

25

(8th Cir. 2008) ("[Defendant] appeared to be of at least average intelligence because… he displayed some understanding of the internet and file-sharing programs."). Similarly, as stated above, Defendant has demonstrated to this Court in *pro se* filings that he understands the legal system. (Doc. 57 at 10).

Defendant also was not physically or mentally susceptible to being coerced into waiving his *Miranda* rights. Certainly, anyone may be fatigued from international travel, but the Eighth Circuit has made clear in much more extreme scenarios that "mental impairments" that do not cause "the defendant's will to be overborne" do not render a confession involuntary. *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (finding that a waiver by a suspect who "had not slept the night before and [] had consumed alcohol and drugs several hours before he waived his rights" was voluntary); *United States v. Casal*, 915 F.2d 1225, 1229 (8th Cir. 1990) (finding that a waiver by a suspect who had recently used methamphetamine and had not slept in five days was voluntary).

Defendant's claim that he did not understand the Czech language well enough to voluntarily waive his *Miranda* rights also is without merit. The Eighth Circuit rejected a near-identical argument in *United States v. DaCruz-Mendes*, 970 F.3d 904 (8th Cir. 2020). There, the arresting officer provided a Brazilian national a copy of a *Miranda* form in Spanish, and the suspect read the form aloud to the officer. *Id.* The suspect then stated in Spanish that he understood his rights and promptly signed the form. *Id.* The suspect later informed police that he could speak both Portuguese and Spanish and spoke with them in Spanish for two hours about the alleged crime. *Id.* at 907. The Eighth Circuit concluded the suspect had the "requisite understanding of Spanish to appreciate the value of his *Miranda* rights." *Id.* at 909.

26

Here, Defendant's behavior is nearly identical. During the search for an interpreter, Defendant spontaneously volunteered to the agents: "Czech works. I understand Czech." (Doc. 249 at 133). For nearly 90 minutes, Defendant then spoke to Ms. Arata in Czech, who translated those remarks into English for the agents. (Doc. 244 at 27-28). Both Ms. Arata and Agent Kraft believed that Defendant understood the substance of the conversation with the agents, and Ms. Arata later testified that Defendant's responses indicated he understood the translated questions. (Doc. 244 at 28).

Even if the agents intentionally refused to allow Defendant to contact the Slovak Consulate—a finding the Court does not make—Defendant still voluntarily waived his *Miranda* rights. Defendant raises Article 36 of the Vienna Convention, which "concerns consular officers' access to their nationals detained by authorities in a foreign country." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 338 (2006). The article provides that "if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner." *Id.* (citing 21 U.S.T. 101).

The Supreme Court and the Eighth Circuit have declined to decide whether the Vienna Convention "grants individuals enforceable rights." *Id.* at 343; *United States v. Santos*, 235 F.3d 1105, 1108 (8th Cir. 2000). Nevertheless, Defendant asserts that his "repeated attempts to invoke his right to consular assistance" rendered his statements and *Miranda* waiver involuntary. (Doc. 266 at 10) (capitalization modified).

In *State v. Buenaventura*, 660 N.W.2d 38, 46 (Iowa 2003), *aff'd on federal habeas*, *Buenaventura v. Burt*, 2008 WL 4174910 (N.D. Iowa August 29, 2008), the Supreme Court of Iowa rejected a similar attempt to "bootstrap [an] alleged treaty violation into a constitutional

27

violation." In *Buenaventura*, the parties stipulated that "had the Phillipine consulate been notified of Buenaventura's detention, it would have advised him to talk to an attorney before giving a statement." *Id.* The defendant testified that he would have followed this advice because "he feared he would be beaten if he did not confess." *Id.*

The Supreme Court of Iowa noted that "even assuming Buenaventura's rights under the Vienna Convention were violated, that singular fact would not necessarily render his statements to the police involuntary" because "the voluntary nature of a statement depends on the totality of the circumstances." *Id.* at 46. The Court found "scant support" in the record for Buenaventura's claim considering that he continued to deny his culpability "despite [his] alleged apprehension that the police would beat him if he did not confess." *Id.* at 47.

The result is the same here. Defendant implies that he would not have waived his *Miranda* rights if he had been given the opportunity to obtain an attorney through the Slovakian Embassy. But the *Miranda* form read to Defendant informed him that he had the right to an attorney without any suggestion that an attorney had to be arranged by the Slovak Embassy. *See United States v. Ortiz,* 315 F.3d 873, 886-87 (8th Cir. 2002) ("No doubt [the consul] would have informed them of their rights, including the right to obtain counsel, and would have done so in Spanish. But they had already been adequately informed of this right. There is no evidence that receiving this information from the consul would have changed their conduct… [or that they] would have chosen not to waive their *Miranda* rights.").

On this record, there is no evidence that Defendant's will was overborne such that his waiver of *Miranda* rights was anything but voluntary.

*Defendant's Statements During the Interview Do Not Violate* Missouri v. Seibert.

28

Finally, Defendant argues the agents used an impermissible "question first" approach that violates the Supreme Court's holding in *Missouri v. Seibert*, 542 U.S. 600 (2004). As a threshold matter, Defendant's reliance on the *Seibert* plurality opinion is misplaced. Only four justices agreed with the opinion cited by Defendant. "Justice Kennedy supplied the fifth vote necessary to make a majority [in *Seibert*], and in his concurring opinion he developed a narrower test." *United States v. Briones*, 390 F.3d 610, 613 (8th Cir. 2004). "Because Justice Kennedy relied on grounds narrower than those of the plurality," his opinion is controlling. *Id.* (citing *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994); *Marks v. United States*, 430 U.S. 188, 193 (1977)).

Justice Kennedy's *Seibert* concurrence developed the following approach. First, courts must evaluate whether a "deliberate two-step strategy" was "used in a calculated way to undermine the *Miranda* warning." *Seibert*, 542 U.S. at 621 (Kennedy, J., concurring). If a deliberate "interrogation first, *Miranda* second" approach was used, then "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.* But if the interrogating officers did not use a deliberate two-step approach, then the principles of *Oregon v. Elstad*, 470 U.S. 298 (1985), apply.

Based on the record before the Court, the agents do not appear to have "used a multi-step interrogation in 'a calculated way to undermine the *Miranda* warning.'" *United States v. Hernandez-Hernandez*, 384 F.3d 562, 566 (8th Cir. 2004) (quoting *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring)). Before obtaining a translator, Agent Kraft only asked Defendant to explain Defendant's relationship to his traveling companion, his wife. (Doc. 249 at 22). Agent Kraft did so to determine if Defendant's companion could impartially translate the interview. (Doc. 249 at 22). After determining that Defendant's wife would not be an impartial translator,

29

the agents ceased questioning until Ms. Arata, the FBI translator, was on the phone. (Doc. 249 at 22).

Nor did the agents use Defendant's pre-*Miranda* statement identifying his wife to obtain any post-*Miranda* warning statements. *See Seibert*, 542 U.S. at 621 (Kennedy, J., concurring) ("[T]he interrogating officer here relied on the defendant's prewarning statement to obtain the postwarning statement used against her at trial."). Therefore, "it seems much more likely" that Agent Kraft asked Defendant about his wife for the purpose of communicating with Defendant, rather than as an "intentional, nefarious plot" to withhold Defendant's *Miranda* rights and obtain a confession. *Ollie*, 442 F.3d 1135, 1142 (8th Cir. 2006) (quoting *Reinert v. Larkins*, 379 F.3d 76, 91 (3d Cir.2004)) (emphasis omitted). *Seibert* does not require suppression of Defendant's pre-*Miranda* statements.

*Elstad* similarly does not require suppression of Defendant's statements. *Elstad* held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." 470 U.S. at 318. As long as both the first and second statements are voluntarily made, the *Elstad* Court reasoned, the second statement is admissible even if the first statement "technically" violates *Miranda*. *Id.*

The analysis of whether a waiver of rights is voluntary and whether statements were made voluntarily "is essentially the same." *United States v. Havlik*, 710 F.3d 818, 822 (8th Cir. 2013) (citing *Colorado v. Connelly*, 479 U.S. 157, 170 (1986)). Defendant voluntarily waived his *Miranda* rights, and his statements were made voluntarily.

30

The Government proved by a preponderance of the evidence that Defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights, and Defendant's statements are not to be suppressed.[10] Defendant's Motion to Suppress Evidence on these grounds is denied.

**Defendant Did Not Unequivocally Request a Lawyer Until the End of the Interview.**

If a suspect who has waived his *Miranda* rights—specifically, his right to counsel during custodial interrogation—"requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis v. United States*, 512 U.S. 452, 458 (1994) (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1994)). This Court already has concluded Defendant was not in custody. Regardless, a suspect's request for counsel must be unambiguous and unequivocal. *Id.* at 459. In other words, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.*

Defendant first claims he asserted his right to counsel at approximately 1:16:00 of the translated interview through the following exchange:

> Agent Ogurek [in English]: OK. And then it says at this time I am willing to answer questions without a lawyer present.
> Ms. Arata [translating English to Czech]: Like, they are saying it in first person, like you: At this time I am willing to answer questions without a lawyer present.
> Defendant [in Czech]: I don't know what I am supposed to testify about. I don't know what this is about. Nobody has told me anything.
> Ms. Arata [translating Czech to English]: OK. He says he doesn't know what it's all about. So...

---

[10] Defendant's statements include certain spontaneous statements. The Magistrate Judge recommended that all of Defendant's spontaneous statements are admissible. (Doc. 249 at 128-29). *See McGlothen*, 556 F.3d at 701. This Court adopts the Magistrate Judge's recommendation. Thus, for the additional reason that they were spontaneous utterances, Defendant's statements that he understands the Czech language, statements suggesting he understands the English language, and statements in the Slovak and English languages that his colleague "Michal" uses his phones and laptop computer will not be suppressed at trial.

Agent Ogurek [in English]: OK. Well. Can you just tell him that before we ask him any questions, we just have to, um, get his willingness to talk to us? Right now, without an attorney.

Ms. Arata [translating English to Czech]: So, he just says that before he can, like, tell you what it is all about, he needs your consent that you will, like, answer questions without the lawyer present.

Defendant [in Czech]: Hm. I would like to call the Slovak Embassy to get some information why I am here because I totally do not understand.

Ms. Arata [in Czech]: So it means you do not want to talk until you have a lawyer? Because he cannot, like, tell you that without your consent to speak with him.

Defendant [in Czech]: OK, I will sign. I want to know what it is about. But I can stop it at any time, correct?

(Doc. 229-1; Ex. A at 10).

Defendant's statement that he "would like to call the Slovak Embassy to get some information why I am here because I totally do not understand" is not an unambiguous and unequivocal request for counsel. In fact, Defendant did not utter the word "lawyer" or "attorney." Nor would it be clear to a reasonable investigator that the mere mention of a foreign embassy (which may or may not provide counsel) by a foreign suspect unambiguously and unequivocally invokes the right to counsel. *See Davis*, 512 U.S. at 461 (noting the *Edwards* rule is driven by "clarity and ease of application" so as not to require officers to make "difficult judgment calls about whether the suspect in fact wants a lawyer"); *see also Fare v. Michael C.*, 442 U.S. 707, 723-24 (1979) (holding "that a request by a juvenile to speak with his probation officer" does not constitute "a per se request to remain silent" "since a probation officer does not fulfill the important role in protecting the rights of the accused juvenile that an attorney plays").

Defendant's arguments notwithstanding, he also did not unambiguously and unequivocally invoke his right to a lawyer at approximately 2:29:41 of the interview:

Defendant [in Czech]: Then they need to give me the lawyer. I cannot tell them anything else. I….

Ms. Arata [in Czech]: What did you say about the lawyer?

Agent Kraft [in English]: Let's just get this on the record.

32

> Ms. Arata [in Czech]: Pardon me?
> Agent Kraft [in English]: Michal uses your…
> Ms. Arata [in Czech]: Michal…
> Defendant [in Czech]: Wait, he wants to say something, this gentleman.

(Doc. 229-1 at 12).

Defendant did not request an attorney in a language the interviewing agents could understand. A suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 461. The agents provided Defendant with a Czech translator, but Defendant never clearly communicated to the translator that he wished to invoke his right to counsel. (Doc. 229-1 at 12). The translator expressed confusion about Defendant's statements in Czech. (Doc. 229-1 at 12) ("What did you say about the lawyer?... Pardon?). It is difficult, if not impossible, to see how a reasonable officer in the agents' position could have understood these Czech statements as an unambiguous and unequivocal request for a lawyer.

Defendant also initiated further discussion after making this statement. "Once a defendant expresses a desire to deal with the police only through counsel, the police may not further interrogate the defendant until 'counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversation with the police.'" *Holman v. Kemna*, 212 F.3d 413, 417 (8th Cir. 2000) (quoting *Edwards*, 451 U.S. at 484-85). Initiation by a defendant occurs when the defendant evinces "a willingness and a desire for a generalized discussion about the investigation." *Id.* at 417 (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983) (plurality opinion)).

After Agent Kraft said, "Michal uses your…," Defendant responded, "Wait, he wants to say something, this gentleman." (Doc. 229-1 at 12). This was an expression of Defendant's intent for Agent Kraft to continue asking him about his alleged ties to "Michal." *See Bradshaw*, 462

33

U.S. at 1045 ("There can be no doubt in this case that in asking, 'Well, what is going to happen to me now?', [the suspect] "initiated" further conversation in the ordinary dictionary sense of that word.").

In short, Defendant did not unambiguously and unequivocally request a lawyer until approximately 02:44:50 of the interview. All of Defendant's statements (including his recorded statements during the interview) until he invoked his right to a lawyer at approximately 02:44:50, are not to be suppressed. Because Defendant made no further statements to the agents after that time, Defendant's Motion to Suppress Evidence is denied on this ground.[11]

### **Speedy Trial**

The Speedy Trial Act, 18 U.S.C. § 3161(h)(1), excludes from the speedy trial calculation "[a]ny period of delay resulting from other proceedings concerning the defendant, including but not limited to . . . (D) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion; . . . and (H) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court."

Section 3161(h)(7) of the Act continues:

(A) Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the

---

[11] This Court denies any and all other grounds for suppression of Defendant's post-*Miranda* statements raised in Defendant's Motion to Suppress Evidence.

ends of justice served by the granting of such continuance outweigh the best
interests of the public and the defendant in a speedy trial.

(B) The factors, among others, which a judge shall consider in determining
whether to grant a continuance under subparagraph (A) of this paragraph in any
case are as follows:

> (i) Whether the failure to grant such a continuance in the proceeding would be likely
> to make a continuation of such proceeding impossible, or result in a miscarriage of
> justice.
> (ii) Whether the case is so unusual or so complex, due to the number of defendants,
> the nature of the prosecution, or the existence of novel questions of fact or law, that it
> is unreasonable to expect adequate preparation for pretrial proceedings or for the trial
> itself within the time limits established by this section.
> […]

This Court has required substantial time to conduct its *de novo* review of the Report and
Recommendation. On August 13, 2025, the Magistrate Judge issued her 140-page Report and
Recommendation. (Doc. 249). On August 27, 2025, both parties filed objections to the Report
and Recommendation. (Docs. 253; 255). Defendant sought, and was granted, leave to file
"overlength" objections to the Report and Recommendation, in which Defendant objected to
"each and every one of the Report's rulings and recommendations denying him the relief he
requested in his pretrial motions." (Docs. 254; 255 at 4; 256). On September 9 and 10, 2025, the
parties filed responses to the objections. (Docs. 265; 266). Considering the unusual length and
complexity of the Report and Recommendation, and that every recommendation in the Report
and Recommendation is challenged by at least one party, this Court has found it "impossible" to
conduct the necessary review and rule on every objection to the Report and Recommendation
before now.

Those same reasons also weigh in favor of continuing to consider this an unusual and
complex case. The Magistrate Judge previously found this to be an unusual and complex case
pursuant to 18 U.S.C. § 3161(h)(7)(B)(ii) due to multiple factors, including the nature of the

prosecution and the nature and volume of discovery. (Doc. 85). The litigation surrounding the issues addressed in the Report and Recommendation underscores that point. As the Magistrate Judge found, "the record is replete with instances where [Defendant] has asked the Court for continuances of pretrial matters. He has filed over-length briefs and repeated arguments made by prior counsel, causing the docket to overflow with filings that must be resolved prior to the parties proceeding to trial. . . . Defendant's assertion of his right is tempered by his approach to the pretrial litigation in this case and his decisions to file 'kitchen-sink' motions." (Doc. 249 at 70). "It is [Defendant] who has persisted in prolonging these proceedings rather than insisting on the start of trial." (Doc. 249 at 71). This Court adopts the Magistrate Judge's findings in this regard. Given the nature of the prosecution and Defendant's "kitchen-sink" approach to litigating the case, this Court finds that this continues to be an unusual and complex case under 18 U.S.C. § 3161(h)(7)(B)(ii).

In any event, the Court, taking into account the exercise of due diligence, weighs the ends of justice served by conducting its *de novo* review of the record, including the Magistrate Judge's Report and Recommendation, the transcripts, and the parties' motions, memoranda, and exhibits, against the best interests of the public and Defendant in a speedy trial pursuant to 18 U.S.C. § 3161(h)(7)(A). Pursuant to that weighing analysis, the Court finds the ends of justice served by any delay occasioned by this Memorandum and Order outweigh the best interests of the public and Defendant in a speedy trial.

## CONCLUSION

**IT IS HEREBY ORDERED** that Defendant's Motion for Return of Property (Doc. 100) is DENIED;

36

**IT IS FURTHER ORDERED** that Defendant's Motions for Translation of Court Documents to Slovak (Docs. 69, 76) are DENIED;

**IT IS FURTHER ORDERED** that Defendant's Motion for Bill of Particulars (Doc. 99) is DENIED;

**IT IS FURTHER ORDERED** that Defendant's Motions to Dismiss Under Rule 48(b) (Docs. 76, 126, 143) are DENIED;

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss for Failure to State an Offense, filed prior to the superseding indictment, (Doc. 131) is DENIED;

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss for Failure to State an Offense (Doc. 196) is DENIED;

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss Count 11 for Multiplicity (Doc. 217) is DENIED.

**IT IS FURTHER ORDERED** that Defendant's Motion for Admission into Evidence of Transcription and Translation of Recording (Doc. 213) is GRANTED;

**IT IS FURTHER ORDERED** that the United States' Motion for Determination that Defendant Has Failed to Make the Necessary Showing for a *Franks* Hearing (Doc. 118) is GRANTED;

**IT IS FINALLY ORDERED** that Defendant's Motion to Suppress Evidence (Doc. 98) is DENIED.

Dated this 2nd day of December 2025.

_____
CRISTIAN M. STEVENS
UNITED STATES DISTRICT JUDGE

37